654 N.E.2d 517 (1995)
274 Ill.App.3d 951
211 Ill.Dec. 55
In the Interest of J.W., a minor (The People of the State of Illinois, Petitioner-Appellee, v. J.W., a minor, Respondent-Appellant).
No. 1-94-2834.
Appellate Court of Illinois, First District, Second Division.
August 8, 1995.
*518 Sonnenschein, Nath & Rosenthal, Chicago (Sally M. Davis and Liza M. Franklin, of counsel), for appellant.
Jack O'Malley, State's Atty, Chicago (Renee Goldfarb, Barbara L. Jones, and Christine L. Kornak, of counsel), for appellee.
Justice HARTMAN delivered the opinion of the court:
J.W., a minor, was adjudicated delinquent for committing acts that made him accountable for the offense of first degree murder. (720 ILCS 5/9-1(a) (West 1992).) J.W. appeals *519 from the rulings of the circuit court, questioning whether (1) the circuit court erred in denying his motion to quash arrest and suppress evidence; and (2) his statement was sufficiently attenuated from the arrest to be admissible.
On May 24, 1994, a hearing was held on J.W.'s motion to quash arrest and suppress evidence. J.W. testified that on March 23, 1994, he was 14 years old and in the eighth grade at Bunche school. At approximately 1:45 p.m., he was called to the principal's office, where the assistant principal and three police officers were waiting. As J.W. walked into the office, one police officer stayed in the office, and the other two walked out and stood on either side of the door. Sergeant Lewis introduced himself, told J.W. that he wanted to ask some questions regarding the homicide of Byron Drew, and asked J.W. if he had any relatives living near school. Upon his reply, Lewis called J.W.'s home, which was five blocks from school, and talked to his brother, who told him that their mother was not there. J.W. testified that Lewis then called his grandmother, who lived in a separate home. A school security guard and Officer William Bertha thereafter escorted J.W. back to the classroom to pick up his book bag and coat. According to J.W., Bertha walked alongside J.W. with his left hand on J.W.'s left shoulder, but said nothing.
The police officers then took J.W. to the police station. J.W. testified that at the time he was scared and felt that he had to go with them. J.W. was never told during the ride that he did not have to go to the police station or that he was not under arrest. He was placed in the back of the police car with Sergeant Lewis, and Officer James Oliver drove; Officer Bertha left in a separate car. As J.W. was about to remove a book from his bag, Lewis asked him what was in there, then searched the bag, and told him to zipper it up. J.W. testified that there were no door handles in the back seat of the car. They then stopped at Church's Chicken because Lewis said he was getting hungry. Lewis exited the car to get the food, and Oliver and J.W. stayed in the car.
When they arrived at the station, Sergeant Lewis walked with J.W. on his left side, and Officer Oliver had his left hand on J.W.'s left shoulder. J.W. was placed next to a table in a large room, where he read his spelling book for awhile; Officer Bertha also sat at the table. The officers then walked J.W. to a file room, where he waited for about five minutes. Although the door to the file room was left open, J.W. felt that if he walked out they would have locked him up. The officers then took J.W. to another large room, where he was questioned. The door to that room was also open. J.W. was not told that he was not under arrest or that he was free to leave.
J.W. told police he had no knowledge about the homicide of Byron Drew. Sergeant Lewis then told J.W. not to "mess with them" because they had three witnesses and fingerprints, and if those witnesses implicated J.W. in the murder, he would be put away without any questions.
On cross-examination, J.W. stated that when he was at the school, he did not want his other classmates to know he was talking to the police. He also said he was treated well by the police and was willing to answer any questions that they had. During this period, J.W. was not told that he was under arrest, and he was not fingerprinted, handcuffed, or photographed until approximately 8 p.m. the same day, when he was "booked." J.W. testified that he was arrested once or twice before and, at that time, was handcuffed, was told he was under arrest, and was asked "booking" questions.
Officer Oliver testified that on March 23, 1994, while investigating the homicide of Byron Drew, he had a conversation with the victim's father at approximately 12 p.m. The father told Oliver that J.W. was a witness to his son's murder, that he knew something about the shooting, and that J.W. attended the Bunche school at 65th and Ashland. Oliver, Officer Bertha, and Sergeant Lewis went to the school and spoke with the principal. A teacher's aide brought J.W. to the principal's office. The principal asked J.W. for his home telephone number, and the school clerk called his home and spoke with the grandmother. Prior to the call, Oliver gave the school clerk his name, telephone number, and information regarding where they would be going.
*520 After J.W. agreed to speak to the officers about an incident in July 1993, Officer Oliver told J.W. that they would be going to the Area Two police station. J.W. was brought to the police station because Oliver did not have the police reports with him, there was no privacy at the school, and it was an Area Two case. Oliver stated on cross-examination that he never asked the principal if they could use a room in the school to speak to J.W. privately. Oliver never told J.W. that he did not have to go to the police station or that an adult family member may accompany him to the station.
Officer Oliver testified that he did not tell J.W. how they were getting to the police station, but did not think J.W. had any way of getting there on his own. Sergeant Lewis accompanied Oliver in the front passenger seat of the car, and J.W. sat alone in the back. Officer Bertha drove his own car. J.W. was neither handcuffed nor was he told that he was under arrest.
When they arrived at the station at 2:30 p.m., J.W. sat at a desk, waiting for Detective Karl to arrive. Karl, Sergeant Lewis, and Officers Oliver and Bertha then interviewed J.W. in a big, open conference room. J.W. denied any knowledge of the homicide. Oliver, dissatisfied with J.W.'s answer, asked him more questions. After approximately 10 to 15 minutes more of questioning, J.W. admitted his involvement in the murder.[1] J.W. stated that in July of 1993, Gregory Johnson, the other suspect in the homicide, picked him up in a red Mustang and drove him to 76th and Yates. There, Johnson shot Byron Drew, gave the gun to J.W., and then drove a short distance and gave J.W. $5.
After hearing J.W.'s statement, Detective Karl called for an assistant State's Attorney and a youth officer, and contacted J.W.'s family.[2] It was approximately 4:30 or 5 p.m. at this point. Some time later, J.W. gave a "short version" of his statement with the assistant State's Attorney present. The assistant State's Attorney then read J.W. his Miranda rights. J.W. said he understood and wanted to tell the truth.
According to Officer Oliver, J.W. told them that Gregory Johnson approached him in July 1993 about accompanying Johnson on a "hit." J.W. agreed. On the day of the shooting, Johnson picked up J.W. and drove him to Johnson's apartment, where they picked up a gun and ski masks. They drove in a red Mustang to 76th and Yates. They saw Byron Drew working on his car. Later, they pulled up next to Drew. When J.W. could not shoot the gun, Johnson took it from him and shot Drew. Johnson exited the car and shot Drew again. Later, Johnson gave J.W. $5. Oliver testified that after J.W. gave his statement, he formally was placed under arrest.
Prior to questioning J.W., Officer Oliver learned that a red Mustang carrying two people was at the scene of the homicide and that Gregory Johnson was already in police custody. Oliver denied placing his hand on J.W.'s shoulder as he walked with him from the police car to the station.
Officer Bertha testified that he and a school security guard accompanied J.W. from the principal's office to his classroom to pick up his books. He also did not recall placing his hand on J.W.'s shoulder at that time. On cross-examination, Bertha agreed that he walked with J.W. to make sure that he got to the classroom and then back to the principal's office.
On May 31, 1994, the circuit court found that J.W. was not under arrest, but was instead merely a witness until about 3:30 p.m., when he changed his story and implicated himself in the shooting. On the issue of whether J.W. was physically constrained when he was walked to his classroom to pick up his coat and books, the court found the testimony of Officer Bertha more credible. Further, no "trappings of an arrest" were present in the police car. Prior to J.W.'s incriminating statement, a reasonable, innocent person would not have considered himself *521 under arrest. The court denied the motion to quash arrest and suppress evidence.
On June 6, 1994, an adjudication hearing was held. Chicago police officer Dee Williams testified that on July 19, 1993, at approximately 8 p.m., she responded to a report of a man having been shot at 7622 S. Phillips. At the scene, Williams saw paramedics working on Drew, who had been shot. She interviewed three witnesses, Diane Winters, James Commons, and John Johnson (John), and took notes.
John testified that on July 19, 1993, he was a self-employed construction worker, employed at 7649 S. Yates, with Commons, working on the back porch of 7649 S. Yates facing the alley. They heard two or three gunshots fired within a span of one or two minutes. A few minutes later, John saw a red sports car speeding through the alley. The passenger side of the car was closest to him, but because the windows of the car were tinted, he was unable to see inside. John went to the alley and saw people gathered around a black male lying on the ground. On cross-examination, John denied reporting that the driver of the car was young or that the second person was between the ages of 20 and 30.
Detective Karl testified concerning J.W.'s second confession, when the assistant State's Attorney was present, which tracked that given by Officer Oliver at the motion to suppress. After J.W.'s initial confession, Karl called J.W.'s grandmother around 4:00 p.m. She would go to the station as soon as she could locate J.W.'s mother. J.W.'s mother and grandmother eventually arrived at the police station shortly before 5:00 p.m. At that time, Karl and the assistant State's Attorney had a conversation with J.W., his mother, and his grandmother. After that conversation, J.W. talked to his mother and grandmother alone for about 5 to 15 minutes. Shortly thereafter, at approximately 6:45 p.m., J.W.'s written, four-page statement was signed on each page by J.W., his mother, his grandmother, the assistant State's Attorney, and Karl. That statement was admitted into evidence over his objection.
After the State rested, it was stipulated that if Officer Williams was recalled to testify, she would state that on the evening of the homicide, Commons and John told her they were parked in the alley near the corner of 77th and Phillips when they saw a red sports car speed through the alley. They advised her that the driver of the car appeared to be very young and that the second person appeared to be between the ages of 20 and 30 years old.
After hearing argument at the close of the evidence, the circuit court entered a finding of delinquency on the charge of murder. On July 22, 1994, the court sentenced J.W. to the custody of the Illinois Department of Corrections, Youth Division. J.W. timely filed a notice of appeal.

I
J.W.'s primary contention on appeal is that the circuit court erred in denying his motion to quash the arrest and suppress the confession because he was seized without probable cause and questioned as though he were a suspect.[3] J.W. points to numerous facts indicating that he was in fact seized by the police and was not merely questioned as a witness. The State responds that J.W. voluntarily accompanied the police to the station and voluntarily remained there until he made the incriminating statement.
Our supreme court has made it clear that "arrest" in the context of the fourth amendment is not equivalent to "custody" for the purpose of fifth amendment compulsion. (People v. Melock (1992), 149 Ill.2d 423, 432, 174 Ill.Dec. 857, 599 N.E.2d 941. Cf. United States v. Smith (7th Cir.1993), 3 F.3d 1088, 1097 (explaining that the inquiry in a Miranda case, which is concerned with the fairness of the trial, is "much narrower" than a fourth amendment issue).) This ruling diverges from other Illinois decisions that consider the same factors in deciding these "separate *522 and distinct" issues. (Compare People v. Matthews (1990), 205 Ill.App.3d 371, 402-03, 150 Ill.Dec. 310, 562 N.E.2d 1113 and People v. Cole (1988), 168 Ill.App.3d 172, 179, 118 Ill.Dec. 965, 522 N.E.2d 635 with People v. Lucas (1989), 132 Ill.2d 399, 417-18, 139 Ill.Dec. 447, 548 N.E.2d 1003 and People v. Smith (1986), 150 Ill.App.3d 524, 528, 103 Ill.Dec. 693, 501 N.E.2d 1010.) Here, both the State and defendant use the analytical framework employed in Cole and Matthews, which the Melock court has held should be reserved for Miranda issues. We follow the distinction announced in Melock.
Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. (U.S. Const., amend. IV; Ill. Const.1970, art. I, § 6; People v. Melock (1992), 149 Ill.2d 423, 436, 174 Ill.Dec. 857, 599 N.E.2d 941.) A seizure, for fourth amendment purposes, is synonymous with an arrest. Absent probable cause or a warrant based thereon, an arrest violates the fourth amendment. (Melock, 149 Ill.2d at 436, 174 Ill.Dec. 857, 599 N.E.2d 941.) A person has been arrested when his or her freedom of movement has been restrained by means of physical force or a show of authority. (Melock, 149 Ill.2d at 436, 174 Ill.Dec. 857, 599 N.E.2d 941.) The relevant inquiry in determining whether a suspect has been arrested is whether, under the circumstances, a reasonable, innocent person (in this instance a 14 year old minor), in defendant's situation, would conclude that he was not free to leave. Melock, 149 Ill.2d at 437, 174 Ill.Dec. 857, 599 N.E.2d 941; People v. Reynolds (1983), 94 Ill.2d 160, 165, 68 Ill.Dec. 122, 445 N.E.2d 766.
Conflicts in the testimony must be resolved by the trier of fact based upon the credibility of the witnesses. (People v. Buie (1992), 238 Ill.App.3d 260, 269, 179 Ill.Dec. 447, 606 N.E.2d 279.) A reviewing court will not disturb the circuit court's finding on a motion to suppress unless that finding is manifestly erroneous (Reynolds, 94 Ill.2d at 165, 68 Ill.Dec. 122, 445 N.E.2d 766); nevertheless, where neither the facts nor credibility of witnesses is challenged, the issue of whether probable cause existed for an arrest is a legal question which a reviewing court may consider de novo. (People v. Foskey (1990), 136 Ill.2d 66, 76, 143 Ill.Dec. 257, 554 N.E.2d 192; In re D.G. (1991), 144 Ill.2d 404, 408-09, 163 Ill.Dec. 494, 581 N.E.2d 648; People v. James (1994), 163 Ill.2d 302, 310, 206 Ill.Dec. 190, 645 N.E.2d 195.) In such circumstances, when an appellate court "reviews only the trial court's legal conclusions on a suppression motion, * * * [it] need not afford the trial court's decision deference * * *." People v. Shepherd (1993), 242 Ill. App.3d 24, 28, 182 Ill.Dec. 739, 610 N.E.2d 163.
The primary inquiry here is whether J.W. was under arrest prior to making his incriminating statement to the police.[4]
In cases involving juveniles, our courts are especially cautious because the coerciveness of a situation is thereby enhanced. (R.B., 232 Ill.App.3d at 592, 173 Ill.Dec. 905, 597 N.E.2d 879.) Here, J.W. was 14 years old and in the eighth grade when the police questioned him. J.W. had been arrested once or twice before, and on those occasions, he was placed under arrest, handcuffed, and asked booking questions. It is clear that J.W. was young at the time of the police questioning. There was scant evidence of whether his past experience with the police was so extensive as to cause him to believe that he was a suspect under arrest or was merely a witness, and whether he was aware of the legal implications attendant to being only a witness (e.g., that he was free to leave). J.W.'s age alone is sufficient reason to closely scrutinize the circumstances surrounding the incident.
The undisputed evidence shows that three police officers initially met J.W. in the school principal's office. As many as four officers questioned him in the conference room at the police station. The fact that four police officers questioned 14-year-old J.W. negates the State's contention that J.W. could reasonably believe that he merely was a potential witness *523 in the investigation, and not a suspect in the homicide. The number of officers present also demonstrates that this 14 year old was confronted with a coercive and intimidating environment at the station.
J.W. also contends that the police limited his freedom of movement at the school, in the police car, and at the police station. On the issue of whether Officer Bertha placed his hand on J.W.'s shoulder during the escort back to J.W.'s classroom, the circuit court found Bertha's testimony more credible and we are bound to accept this finding. Although the court observed that it was also reasonable for the security guard to escort J.W. in the hallways in light of the current situation in the Chicago public schools, Bertha himself stated that he accompanied J.W. "to make sure" that he got to the classroom and then returned to the principal's office. "To make sure" J.W. returned demonstrates Bertha's belief that he presented a risk of flight.
Also accepting the testimony concerning the car ride to the police station, namely, that Sergeant Lewis rode in the front seat, we disagree with the circuit court's conclusion that "the trappings of an arrest" were not present because the officers took no action to restrain J.W.'s freedom of movement. It is uncontradicted that J.W. had no way of exiting the car without police assistance since neither rear door was equipped with an exit handle. This evidence establishes that the police effectively locked J.W. in the police car to restrict his freedom. There was no evidence that the second police car driven by Officer Bertha to the station, in which J.W. could have ridden, was missing rear door handles.
With regard to the alleged restraints on J.W.'s freedom of movement in the station, Officer Oliver testified that he was with J.W., who was not handcuffed for the entire time he was there. Although the evidence indicates that the door of the conference room was open when J.W. was questioned, it does not necessarily follow that a reasonable, innocent 14-year-old would have felt free to get up and leave under these circumstances.
J.W. contends that being brought to the police station, instead of a less oppressive setting, supports the conclusion that he was under arrest. Officer Oliver testified that he questioned J.W. at the station because he did not have the police report with him at the school, there was no privacy at the school, and it was an Area Two case. With regard to the privacy issue, Officer Oliver admitted that he never asked the principal whether another room was available to speak to J.W. in private. J.W. stated that he would not have wanted to talk to the police in front of his classmates or the school principal, but denied that he would rather have been questioned at the police station. It is well understood that interrogation at the police station is inherently coercive (see Dunaway v. New York (1979), 442 U.S. 200, 207, 99 S.Ct. 2248, 2253, 60 L.Ed.2d 824, 832), especially when a minor is involved. Having been driven to the station, J.W. was in effect stranded there, buttressing the conclusion that a reasonable person in his situation would not have felt free to leave.
J.W.'s next argument, that the police never told him he was free to leave, is supported by the record. J.W. testified that he went to the station because he felt he had no choice. He thought that if he walked out of the station, he would have been locked up. These also are factors to consider in determining whether J.W. was seized in violation of his rights. See People v. Vega (1990), 203 Ill.App.3d 33, 42, 148 Ill.Dec. 386, 560 N.E.2d 983.
Finally, J.W. points to the police's method of questioning him at the station. The evidence shows that when the police began questioning J.W. about the murder, he told them that he knew nothing about the matter. Officer Oliver testified that he did not tell J.W., after his initial denial of any knowledge of the homicide, that he was free to leave the station. Instead, Detective Karl told J.W. that the police had received information that J.W. had witnessed and was present at the homicide.[5] Oliver similarly testified that he *524 was not satisfied with J.W.'s initial answer, did not want him to leave, and asked him more questions. After 10 to 15 minutes more, J.W. admitted his involvement. At this point, J.W. had been with the police for about one and one-half hours.
The questioning in the police station had a "`quality of purposefulness' in that it was `an expedition for evidence' * * * undertaken `in the hope that something might turn up.'" (Dunaway, 442 U.S. at 218, 99 S.Ct. at 2259, 60 L.Ed.2d at 839, quoting Brown v. Illinois (1975), 422 U.S. 590, 605, 95 S.Ct. 2254, 2262, 45 L.Ed.2d 416, 428.) Although J.W. had not been formally arrested at that juncture, physically restrained, booked, or fingerprinted, a reasonable 14 year old person would have been entitled to believe, when the police told him that they had information discounting his statement, that he was in police custody and not free to leave. See Savory, 105 Ill.App.3d at 1029, 61 Ill.Dec. 737, 435 N.E.2d 226.
The State's contention that the police believed J.W. was only a potential witness conflicts with other evidence in the case. Witnesses Commons and John told Officer Williams on the night of the homicide that one of the two people in the speeding car was "very young"[6] and the other was in his twenties. Officer Oliver testified that Gregory Johnson, an adult, was identified as the shooter in the homicide and taken into custody the day after the shooting in July 1993. Therefore, when J.W. was questioned in March 1994, the police were looking for a "very young" suspect and had information that J.W. was present at the shooting. This evidence demonstrates that J.W. was a likely suspect in the case, rather than just a witness, and is consistent with police methods of interrogating J.W. at the police station.
Numerous factors manifestly lead to the conclusion that J.W. was under arrest when he was questioned by the police at the station. In summary, J.W.'s age, the number of officers present, the knowledge and method of interrogation of the officers, the place of questioning, and the lack of any communication to J.W. that he was free to leave, all heavily support J.W.'s contention. All are factors that courts have traditionally evaluated in determining whether a reasonable, innocent person would conclude that he or she was not free to leave. (2 W. LaFave, Search & Seizure § 5.1(a), at 390-92 (2d ed. 1987 & Supp.1995), cited with approval in People v. Holmes (1994), 255 Ill.App.3d 271, 280, 193 Ill.Dec. 379, 626 N.E.2d 412.) Even were we to assume that J.W. initially accompanied the police to the station voluntarily, his presence certainly escalated to an involuntary seizure at some point during the interrogation. See R.B., 232 Ill.App.3d at 592, 173 Ill.Dec. 905, 597 N.E.2d 879.
The dissent relies upon decisions in People v. Williams (1994), 164 Ill.2d 1, 206 Ill.Dec. 592, 645 N.E.2d 844, and People v. Myrick (1995), 274 Ill.App.3d 983, 209 Ill.Dec. 459, 651 N.E.2d 637, but omits certain operative facts distinguishing them from the instant case. In Williams, defendant was a 35 year old adult. Further, she was with a companion when she was approached by one female police officer, who asked if she could speak to her. The police officer suggested that it would be "faster and easier" if they went to the police station for the questioning. Defendant's companion was permitted to ride in the police car with defendant and sat with defendant in a large office at the police station as they waited for detectives who were handling the case. (Williams, 164 Ill.2d at 8-9, 206 Ill.Dec. 592, 645 N.E.2d 844.) In Myrick, only two officers approached defendant, whose fellow gang members were nearby. Defendant in Myrick was 21 years old. As the court stated, "[t]wo officers in an area near friends is not unduly threatening * * * as to make a request to accompany them to the police station coercive." Myrick, at 989, 209 Ill.Dec. 459, 651 N.E.2d 637.
In sharp contrast to Williams and Myrick, J.W. was a minor. He was an eighth grade student. Three police officers pulled into Bunche elementary school in two separate police cars. There, they enlisted the cooperation of the assistant principal, and were reinforced by the school security guard's *525 presence when J.W. was "told" that they would be going to the police station. Unlike the adult defendants in Williams and Myrick, J.W. had no friends or family with him or nearby during his initial contact with the officers, during his ride to the police station, or as he sat alone in the station. Although J.W. lived within blocks from the school, the police did not attempt to drive by his home to locate a family member who could accompany him to the station, but they did stop on their way to the station for chicken, as J.W. waited in the backseat, with rear doors that had no opening handles. Without disputing the circuit court's findings of fact or the weight it accorded the evidence, we conclude that the court's ultimate conclusion, that no arrest was made before defendant gave his statement, upon our review, cannot stand (Foskey, 136 Ill.2d at 84, 143 Ill.Dec. 257, 554 N.E.2d 192; D.G., 144 Ill.2d at 411, 163 Ill.Dec. 494, 581 N.E.2d 648.) The dissent's strident discourse concerning deference simply is irrelevant to these circumstances. Shepherd, 242 Ill.App.3d at 28, 182 Ill.Dec. 739, 610 N.E.2d 163.
The circuit court's determination must be reversed, dependent upon the result of a further hearing as directed under Point II of this opinion.

II
J.W. next argues that his confession, which was obtained by exploiting the illegal arrest, was not sufficiently attenuated from the arrest to enable the State to prove the admissibility of the statements.
The State counters that J.W.'s statement was sufficiently attenuated from the illegal arrest by virtue of giving Miranda warnings, the length of time between the arrest and the confession, confronting J.W. with new information about the homicide, the time J.W. spent with his mother and grandmother at the police station, and the absence of police misconduct.
Ordinarily, evidence secured by illegal means must be suppressed if the evidence has been obtained by exploitation of the initial illegality and not "by means sufficiently distinguishable to be purged of the primary taint." (People v. White (1987), 117 Ill.2d 194, 222, 111 Ill.Dec. 288, 512 N.E.2d 677, quoting Wong Sun v. United States (1963), 371 U.S. 471, 487-88, 83 S.Ct. 407, 417, 9 L.Ed.2d 441, 455.) The factors to consider in determining whether a confession is sufficiently an act of free will to purge the taint of the illegal arrest include: (1) the presence or absence of Miranda warnings, (2) the temporal proximity of the arrest and the confession, (3) the presence of intervening circumstances, and (4) the purpose and flagrancy of the official misconduct. (Brown v. Illinois (1975), 422 U.S. 590, 603-04, 95 S.Ct. 2254, 2261-62, 45 L.Ed.2d 416; White, 117 Ill.2d at 222-23, 111 Ill.Dec. 288, 512 N.E.2d 677.) The burden of showing admissibility rests upon the prosecution. Brown, 422 U.S. at 604, 95 S.Ct. at 2262, 45 L.Ed.2d at 427.
In the instant case, the circuit court was not presented with the attenuation issue. We therefore reverse and remand this matter also for the circuit court's determination of whether sufficient attenuation exists to purge J.W.'s statements from the taint of his illegal arrest. (See People v. Bates (1991), 218 Ill.App.3d 288, 298, 161 Ill.Dec. 113, 578 N.E.2d 240; Vega, 203 Ill.App.3d at 44, 148 Ill.Dec. 386, 560 N.E.2d 983.) If the court finds such attenuation, it is directed to reinstate the judgment of conviction. If the court finds no such attenuation, it is directed to suppress the statements and to conduct further proceedings consistent with this opinion.
Reversed and remanded with directions.
McCORMICK[7], J., concurs.
DiVITO, J., dissents.
Justice DiVITO, dissenting:
The majority's decision violates the wellestablished principle that a reviewing court will not disturb the circuit court's finding on a motion to suppress unless that finding is manifestly erroneous. Although it gives superficial *526 recognition to that standard of review, the majority usurps the trial judge's role in weighing the evidence and in determining what reasonable inferences should be drawn from that evidence. In ignoring the trial judge's findings, putting its own gloss on the evidence, and placing itself in the dual role of fact-finder and fact-interpreter, it trivializes the appropriate standard of review and erroneously concludes that the circuit court erred.
The issue before the trial court was whether, under the circumstances, a reasonable, innocent person in respondent's position would have concluded that he was under arrest or free to leave. (People v. Reynolds (1983), 94 Ill.2d 160, 165, 68 Ill.Dec. 122, 124, 445 N.E.2d 766, 768.) In reviewing the trial judge's conclusions, we are to give deference to his findings of fact and reverse only if those findings are manifestly erroneous. (Reynolds, 94 Ill.2d at 165, 68 Ill.Dec. at 125, 445 N.E.2d at 769.)[1] On a motion such as the one in this case, the burden of proof is on the defendant. People v. Williams (1994), 164 Ill.2d 1, 12, 206 Ill.Dec. 592, 596, 645 N.E.2d 844, 848.[2]
In this case, the murder had occurred in July 1993, eight months before the police interview of respondent. Gregory Johnson had been arrested the day after the murder and had been identified as the shooter. On the day of the interview with respondent, the victim's father told police that respondent had been a witness to the murder of his son; he also told police what school respondent attended. Police had no other information about respondent: they considered him only a potential witness and they had no knowledge concerning his residence. Thus, it was perfectly natural for them to seek out respondent at his school. It was also perfectly natural for respondent to accompany them to the police station, for the police reports in this eight-month-old case were there and because, as respondent himself testified, he did not want his classmates to know that he was talking to the police.
A police report indicated that witnesses had seen two persons in the car that brought the killer to the scene: a very young driver and an occupant between 20 and 30 years of age. (Opinion, at 59 of 211 Ill.Dec. at 521 of 654 N.E.2d.) Because Johnson had been identified as the shooter (the man known to be the driver of the car), presumably police were looking for a 20-to-30-year-old person. There was no evidence that respondent was considered anything but a potential witness.[3]
The majority, however, sees sinister motivation and ominous overtones in the conduct of the police. That there were three officers at the school and four present for the interview, the majority says, "negates the State contention that J.W. could reasonably believe that he merely was a potential witness in the investigation, and not a suspect in the homicide" (opinion, at 60 of 211 Ill.Dec. at 522-23 of 654 N.E.2d), and "also demonstrates that this 14 year old was confronted with a coercive and intimidating environment at the station." (Opinion, at 61 of 211 Ill.Dec. at 523 of 654 N.E.2d.) Interestingly, the majority makes no effort to reconcile those statements *527 with respondent's own testimony that the police treated him well that afternoon, and that he wanted to cooperate with the police, help them with their investigation, and answer any questions they had. Would not any reasonable, innocent person in respondent's position have the same desires?
For the majority, the evidence that a police officer and a school aide accompanied respondent to retrieve his schoolbook and coat demonstrates Officer Bertha's belief that respondent presented a risk of flight. (Opinion, at 60-61 of 211 Ill.Dec. at 522-23 of 654 N.E.2d.) Only a superficial analysis of the record before us could lead to that conclusion. Even apart from the trial court's conclusion concerning the reasonableness of that conduct (to say nothing about the standard of review), there is no justification for concluding from this record that police saw respondent as anything but a witness. More to the point, no reasonable, innocent person in respondent's position could have seen the ominous signs so evident to the majority.
The majority sees more disquieting signs. Yes, respondent was not handcuffed and yes, the door of the room was open but "it does not necessarily follow that a reasonable, innocent 14-year-old would have felt free to get up and leave under these circumstances." Opinion, at 61 of 211 Ill.Dec. at 523 of 654 N.E.2d.
For the majority, the worst manipulation of all was that respondent was brought to a police station. After all, "interrogation at the police station is inherently coercive [citation], especially when a minor is involved" (opinion, at 61 of 211 Ill.Dec. at 523 of 654 N.E.2d) and "J.W. was in effect stranded there." (Opinion, at 61 of 211 Ill.Dec. at 523 of 654 N.E.2d.) The majority's analysis is not burdened by respondent's own testimony that when he was arrested "once or twice" before,[4] he was handcuffed, told that he was under arrest, and asked booking questions none of which, he conceded, occurred on the day in question.
For the majority, "[t]he questioning in the police station had a `quality of purposefulness' in that it was `an expedition for evidence' * * * undertaken `in the hope that something might turn up.'" (Opinion, at 62 of 211 Ill.Dec. at 524 of 654 N.E.2d.) What is the record basis for those ominous statements? It is merely that when respondent said he knew nothing about the killing, the police told him that they had information that he "had witnessed and was present at the homicide" and "asked him more questions." (Opinion, at 61-62 of 211 Ill.Dec. at 523-24 of 654 N.E.2d.) Most citizens would consider that laudable police behavior. But for the majority, respondent "would have been entitled to believe, when the police told him that they had information discounting his statement, that he was in police custody and not free to leave." Opinion, at 62 of 211 Ill.Dec. at 524 of 654 N.E.2d.
That the majority has placed its own gloss on the evidence and has trivialized the standard of review is demonstrated by its own analysis, virtually all of which is summarized above. The standard of review is not satisfied when facts are interpreted so contrary to the conclusions of the trial judge.
The majority's error is brought into sharp focus by comparing its holding to that in People v. Williams (1994), 164 Ill.2d 1, 206 Ill.Dec. 592, 645 N.E.2d 844, where our supreme court affirmed a conviction for first degree murder and the imposition of the death penalty. That case, too, involved a defendant's accompanying a police officer to the station to answer questions. There, police were investigating the strangulation murder of a 97-year-old woman in a Chicago Housing Authority building for seniors. A police officer suspected that the defendant was involved in the murder because she possessed the following knowledge, some of it personal and some provided by a citizen: the defendant had been frequenting the building where the murder had occurred but had stopped going to the building since the time of the murder; the defendant had no friends or relatives in the building and no lawful reason to be in it; the defendant had been seen leaving the building on the day of the murder carrying a box (property had been *528 taken from the victim's apartment); the defendant had been seen choking another resident of the building; a person sought for the strangulation of another elderly person in a neighboring building for senior citizens fit the defendant's description; and, since the date of the murder, the defendant had altered her appearance by shortening her hair and dyeing it red. After the citizen gave her the information and pointed out the defendant, the officer approached the defendant in front of the building and asked her to accompany her to the police station so that detectives who were familiar with the case could speak with her. The defendant agreed; she was not told she did not have to accompany the officer.
At the station, the defendant waited with a companion in the middle of a large office, while the officer told the desk officer that she had a woman with her who had been implicated in a homicide. When the detectives who were handling the case arrived, they asked the companion to step out of the room and, after advising the defendant of her Miranda rights, they talked privately with her. She told the detectives that she had not been to the building where the murder occurred for several years. The detectives talked to the same citizen who had furnished the information to the other officer, and then asked the defendant to sign a consent form for the search of her apartment. The defendant signed the form. After the search, the defendant was shown a stereo recovered from her apartment. The circuit court found that when she responded that she had purchased the stereo as stolen property on the street, the police had probable cause to arrest her.
In affirming the circuit court's finding, the supreme court held that the defendant was not under arrest before she made the incriminating statement. The following facts were among those relevant to the court's conclusion: the defendant was taken to the station because the detectives who were handling the case would be there; the officer who initially approached the defendant was wearing plain clothes and, though armed, did not display a weapon; the drive to the station was not long and the defendant was not handcuffed; the defendant was left unattended in the middle of a large room; the door to the interview room was open; the defendant was not handcuffed; and none of the procedures normally associated with an arrest had been performed. The similarities between those facts and those in this case are obvious. Significantly, the supreme court stated that "[although the officer did not tell defendant that she did not have to accompany her to the station, nothing about these circumstances would lead a reasonable, innocent person to consider herself arrested or to conclude that she was not free to leave." Williams, 164 Ill.2d at 12, 206 Ill.Dec. at 597, 645 N.E.2d at 849.
The supreme court decided that neither the conduct of the officer who took the defendant to the police station nor that of the detectives who interviewed her would have caused a reasonable, innocent person to conclude that she was under arrest or deprived of her freedom. The court reached this conclusion despite the fact that, in contrast to this case, the police had incriminating evidence against the defendant, she was the very focus of the police investigation, she had been given Miranda warnings, and the police asked for and received consent from her to search her apartment.
If the facts in Williams support a finding that a reasonable, innocent person would have felt free to leave, how can it be said that the facts here mandate a different conclusion? How can the majority decision be proper when the trial judge concluded that no arrest had occurred and that there was no basis for a reasonable, innocent person in respondent's position to conclude that he was under arrest? How can it be said that the judge's ruling is manifestly erroneous?
In addressing these questions, the words of our supreme court, in a similar case, are particularly noteworthy:
"What actually took place here was no more than what was minimally necessary for the police to successfully investigate a crime, as is their duty. They were informed that a certain individual might have some knowledge about two burglaries. They asked this individual to come to the station so that they could question him about the burglaries. To hold that this *529 amounted to an arrest would be to hold that virtually any station-house interrogation is necessarily so custodial as to indicate that the person questioned has been placed under arrest. This would mean that the police could not request the presence of anyone, even for noncustodial questioning, unless and until they had probable cause to arrest the person to be questioned. We see no reason to so restrict the investigatory function of the police." People v. Wipfler (1977), 68 Ill.2d 158, 168, 11 Ill.Dec. 262, 265, 368 N.E.2d 870, 873.
The recent case of People v. Myrick (1st Dist.1995), 274 Ill.App.3d 983, 209 Ill.Dec. 459, 651 N.E.2d 637, demonstrates the extent to which a reviewing court abides by the "manifestly erroneous" standard of review. In that case, the appellate court acknowledged that "the events before defendant's station-house statement `look' like an arrest" (Myrick, at 989, 209 Ill.Dec. 459, 651 N.E.2d 637), but nevertheless upheld the circuit court's finding that no arrest had occurred. The "events" to which the court referred included the following: police were seeking the defendant, the last person known to be with the six-month-old infant before his violent death; with oscillating headlights, police pulled up behind the defendant's car; they approached the defendant with drawn guns; they had the defendant put his hands on the car; although his car was there, they drove him to the police station in their car, after he gave his car keys to a friend; at the station, they advised the defendant of his Miranda rights.
The case before us contains none of the troubling facts found in Williams, Myrick, and numerous other cases. Putting aside that the trial judge credited the testimony of the police officers over that of respondent when they were in conflict (a finding that cannot be declared to be manifestly erroneous), the consideration of the facts in this case, either singly or marshalled together in a manner most favorable to respondent, would not have warranted the trial judge's granting of respondent's motion, and it certainly does not warrant the result reached by the majority here.
In taking me to task for "omit[ting] certain operative facts distinguishing [Williams and Myrick ] from the instant case" (opinion, at 62 of 211 Ill.Dec. at 524 of 654 N.E.2d), the majority misses the point and, in so doing, confirms my assertion that it trivializes the standard of review. Williams and Myrick demonstrate the deference associated with application of the "manifestly erroneous" standard of review. That the supreme court in Williams and the appellate court in Myrick relied upon what the majority refers to as "operative facts" to affirm the trial judges' rulings, despite overwhelming evidence that the defendants in those cases were the targets of investigation and where many of the attributes of arrest were present, stands in stark contrast to what the majority has done here. Whereas the Williams and Myrick courts emphasized certain facts to uphold the trial judges' rulings, here the majority stresses certain facts (respondent's age, the absence of friends and family members, and the number of police officers involved), places its own spin on them (inconsistent with the conclusions of the trial judge), and asserts that they justify reversal. By thus abrogating the trial judge's function and thereby violating the standard of review illustrated by such cases as Williams and Myrick, the majority concludes, erroneously and contrary to the trial judge's findings, that respondent was under arrest.
In further response to this dissent, the majority asserts that it does give deference to the trial judge's findings of fact, but "that the court's ultimate conclusion * * * cannot stand." (Opinion, at 63 of 211 Ill.Dec. at 525 of 654 N.E.2d.) Thus, says the majority, my "strident discourse" is "irrelevant." (Opinion, at 63 of 211 Ill.Dec. at 525 of 654 N.E.2d.) These statements represent the majority's implicit recognition that its result cannot be reconciled with the "manifestly erroneous" standard of review. Its effort to justify its result by simply saying the trial judge was wrong and by citing cases that authorize de novo review of questions of law (a situation not present here) constitutes the ultimate mockery of the proper standard of review.
*530 At one time it was customary for the reviewing courts of this State to refer to trial judges as "learned." We long ago put that cliche to rest. The term, however, befits the trial judge in this case. The record shows that he demonstrated great patience and knowledge throughout all these proceedings. During the pre-trial hearing, both sides had adequate opportunity to develop and argue their theories. His final analysis of the evidence and the law was thorough and learned. He applied the correct standards; his findings were justified by the evidence. There is absolutely no basis for stating that his findings were manifestly erroneous.
NOTES
[1] At trial, Detective Karl testified that shortly before J.W. changed his story in the initial interview, Karl had told J.W. that the police had information that J.W. was present at the shooting and had witnessed the homicide.
[2] The result of this contact was not made known until Karl's testimony at the adjudicatory hearing.
[3] J.W. does not argue that his confession was obtained without being advised of his Miranda rights or that it was involuntary in violation of section 3-8 of the Juvenile Court Act, 705 ILCS 405/3-8 (West 1992). See People v. R.B. (1992), 232 Ill.App.3d 583, 592-93, 173 Ill.Dec. 905, 597 N.E.2d 879.
[4] The State makes no contention that probable cause existed to arrest J.W. prior to his initial confession.
[5] In reviewing a circuit court's ruling on a motion to suppress, all the evidence adduced at trial may be considered. People v. Caballero (1984), 102 Ill.2d 23, 36, 79 Ill.Dec. 625, 464 N.E.2d 223.
[6] At trial, Johnson denied making this statement. Commons did not testify at the trial.
[7] Justice McCormick participated in the decision in this appeal prior to his retirement from the Appellate Court of Illinois, First District on August 1, 1995.
[1] The majority's citation to cases allowing de novo review in cases where only a legal question is involved (opinion, at 60 of 211 Ill.Dec. at 522 of 654 N.E.2d) is disingenuous. The majority's effort to somehow justify de novo review betrays its disregard of the appropriate standard of review in this case.
[2] Thus, in referring to "scant evidence" of respondent's experiences (opinion, at 60 of 211 Ill.Dec. at 522 of 654 N.E.2d) and "no evidence" concerning the condition of the second police car (opinion, at 61 of 211 Ill.Dec. at 523 of 654 N.E.2d), the majority, so eager to draw conclusions adverse to the State, compounds its refusal to give deference to the trial judge's findings by failing to attribute the absence of evidence to the proper party.
[3] The majority's assertion that respondent was only a potential witness "conflicts with other evidence in the case" (opinion, at 62 of 211 Ill.Dec. at 524 of 654 N.E.2d), has no record support whatsoever. The majority cites as conflicting evidence that police were told "that one of the two people in the speeding car was `very young' and the other was in his twenties." (Opinion, at 62 of 211 Ill.Dec. at 524 of 654 N.E.2d.) The majority's modification of the facts, particularly its failure to recognize and point out that police had no reason to be looking for a "very young" person, is illustrative of the unjustified interpretation the majority gives to the facts throughout its opinion.
[4] The trial court sustained an objection to the State's question about six separate arrests, a question fully justified by the social investigation that is a part of this record.