THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. ANDRE WALLACE, Defendant-Appellant.

First District (1st Division)    No. 1—96—2299

Opinion filed September 21, 1998.

Rita A. Fry, Public Defender, of Chicago (Michael Davidson, Assistant Public Defender, of counsel), for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, Janet Powers Doyle, and Mari-Rose Vanecko, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GALLAGHER delivered the opinion of the court:

Following a bench trial, defendant Andre Wallace was convicted of first degree murder for the shooting death of Herb Handy. The trial court sentenced defendant to serve a term of 26 years in the Illinois Department of Corrections on the first degree murder conviction. Defendant next filed this appeal, asserting: (1) the trial court erred in denying defendant's motion to quash his arrest and suppress statements; (2) the assistant State's Attorney who transcribed defendant's inculpatory statement improperly advised him of his *Miranda* rights; (3) the trial court erred in excluding defense evidence regarding the victim's allegedly violent and aggressive character; (4) the trial court erred in admitting prejudicial hearsay offered into evidence by the State; and (5) defendant's conviction for first degree murder should be reduced to second degree murder because defendant was sufficiently provoked by the victim.

The victim, Herb Handy, was shot and killed on January 17, 1994, at 825 North Lawndale Avenue in Chicago. Handy had been hired by a real estate company to housesit the residence at that address. The police recovered several 9 millimeter shell casings from the murder scene, and another housesitter, Robert Banks, claimed to have encountered the assailant face-to-face after the shooting. On January 19, 1994, Chicago police officers took defendant to the Area 4 police station for questioning regarding Handy's death. On January 20, 1994, defendant was arrested for the murder of Handy. At the time of the murder, defendant was 15 years old.

Conflicting testimony was offered at the hearing on defendant's motion to quash his arrest and suppress statements. Laron Jackson, testifying on behalf of defendant, stated that he and defendant were walking along the 800 block of North Lawndale Street in Chicago at approximately 8 p.m. on January 19, 1994. At that time, several police officers arrived and stopped Jackson and defendant. The police then searched the two young men, handcuffed them, placed them in a police car and drove them to the Area 4 police station at Harrison and

Kedzie Streets. Jackson testified that neither he nor defendant was asked to accompany the police to the station. At the police station Jackson and defendant were placed in separate rooms and questioned. Ultimately, police placed both men in a lineup.

Coloia Wilkerson also testified for the defense. She stated that she, too, was picked up, handcuffed, placed in a police car and brought to the Area 4 station on January 19, 1994. She stated that she saw defendant in a holding room while at Area 4. Wilkerson further testified that, after being held for seven or eight hours at Area 4, she was released between 3 and 4 a.m. on January 20, 1994.

Defendant testified on his own behalf at the hearing. He corroborated Jackson's version of how and when the police took him to the Area 4 station on January 19. After waiting alone in an interview room for approximately 45 minutes, an officer entered the room and began questioning him about the shooting of Handy on January 17, 1994. Roughly 90 minutes after this initial questioning, Chicago police detective Kristen Kato entered the room and began to question defendant. Defendant stated that he asked Kato if he could go home, to which Kato responded that they would have "to wait and see." Subsequently, Kato left defendant alone—locked in the interview room. Kato later returned and proceeded to question defendant "a lot." Defendant testified that he was handcuffed throughout his stay at the police station and that the police denied him the opportunity to make a phone call. Defendant stated that Detective Kato informed him around 9:15 p.m. that defendant was being charged with Handy's murder.

On cross-examination, defendant testified that he informed police he was a juvenile once he discovered he was being charged with murder. He also testified that he was placed in a police lineup some four or five hours after arriving at the police station. On redirect, defendant stated that he was never advised of his rights during the evening of January 19 and early morning hours of January 20. On recross, defendant acknowledged that he was presented with a form advising him of his rights, but only after he made his inculpatory statement the next day; moreover, defendant claimed that he never read the form and that no one ever read the form to him.

Chicago police detective Eugene Roy testified for the State. Roy said that, around 8 p.m. on January 19, 1994, he and several other police officers obtained the name of defendant and Jackson from unknown individuals engaged in narcotics sales. These unknown individuals indicated to the police that defendant was "working security" for the narcotics operations near the murder scene around the time of the victim's death. Shortly thereafter, Detective Roy, Detective

Kato and three other police officers located defendant and Jackson and asked the two young men to accompany them to the police station. Defendant and Jackson agreed, and the two were searched, placed in separate cars and driven to Area 4. Once they arrived at Area 4, defendant and Jackson were placed in separate interview rooms. The room defendant was placed in was locked. Defendant was never handcuffed. When asked, defendant lied to the police regarding his age and claimed to be 17. Although Roy did not consider defendant under arrest, he and Detective Kato advised defendant of his *Miranda* rights. This was done as a precaution, in the event that defendant might make a statement inculpating himself in Handy's homicide.

Roy further testified that defendant told the detectives that, while "working security" on January 17, the night of the murder, he overheard an argument between his cousin and the victim. After his cousin disappeared down a gangway, defendant heard the sound of three or four gunshots. Acting on this information, the detectives left Area 4 around midnight in an attempt to locate defendant's cousin and other individuals mentioned by defendant in this initial statement. Coloia Wilkerson was one individual mentioned by defendant. Roy and Kato successfully located her and Cedric Smith and brought them to Area 4. When questioned, Ms. Wilkerson gave an account of January 17, 1994, that differed from that given by defendant. The police then confronted Jackson with Wilkerson's statement. Once confronted, Jackson informed police that defendant carried a 9 millimeter pistol while "working security" on the 17th, that defendant got into an argument with Handy, and that defendant disappeared into a gangway near the building where the shooting transpired shortly before gunshots rang out. Defendant was placed in a lineup at about 4 a.m., but the witness, Robert Banks, could not identify anyone. Following the lineup, police once again advised defendant of his *Miranda* rights and then confronted him with the statements of Wilkerson and Jackson. Defendant then made an inculpatory statement to Detectives Roy and Kato. Up until he made this inculpatory statement, defendant was free to go home—despite the fact that he was held in a locked room. Defendant was never informed that he was free to leave.

Several other police officers, including Detective Kristen Kato, also testified for the State and essentially corroborated Detective Roy's testimony. Kato expanded upon Roy's testimony, stating that defendant was placed under arrest at roughly 4:30 a.m. After making his incriminating statement, defendant informed the police that he was only 15 years old. A youth officer, Officer Halko, was contacted and he attempted to corroborate defendant's age. At approximately 6:45 a.m., Assistant State's Attorney Lu Ann Rodi arrived to take defendant's

statement. Defendant was yet again informed of his *Miranda* rights, and Assistant State's Attorney Rodi transcribed his statement, which defendant then signed in the presence of Ms. Rodi, Officer Halko and Detective Halko. On cross-examination, Kato testified that the door was not locked when he left defendant alone in the interview room; however, Kato admitted that defendant was not free to move about the Area 4 police station.

After hearing this and other testimony, the trial court denied defendant's motion to quash his arrest and suppress statements. In denying the motion, the trial court specifically found that the defendant voluntarily accompanied the police to the station. This finding was based upon the fact that defendant indicated as much in his written statement. Moreover, when it denied defendant's motion to reconsider, the trial court noted that the locked door on the interview room did not automatically render defendant an arrestee.

The bench trial occurred on April 19, 1996. The State recalled many of the witnesses it had called during the hearing on defendant's motion to quash his arrest and suppress statements. One of these was Assistant State's Attorney Lu Ann Rodi. Ms. Rodi testified that she met with defendant alone and told him that she would talk to him, that she would give him his *Miranda* warnings when the officers returned, and that they "were going to have a statement." She then transcribed the inculpatory statement given by defendant on January 20, 1994. Through Ms. Rodi's testimony, that statement was admitted into evidence. In his written statement, transcribed by Ms. Rodi, defendant acknowledged that he was apprised of and understood his *Miranda* rights.

Defendant's statement related the following pertinent facts: On the night of the murder defendant was "working security" near 825 North Lawndale while a friend, Shorty C., was selling drugs. Defendant was armed with a fully loaded, black gun. At approximately 8 p.m., the victim came toward the defendant's position and told him to "get away from the house or I will kick your ass." Defendant responded, "You can't tell me what to do," and a verbal confrontation ensued. This argument continued after the victim entered the house on Lawndale, as the victim shouted at defendant through an open, second-story window. The victim challenged defendant to come inside the house. Defendant tried to gain access to the house, but the door was locked. Defendant ultimately climbed through a window toward the rear of the house. After he entered through the window, defendant saw the victim about 15 feet away with a baseball bat. Defendant shot the victim about three times. As he tried to leave the house, defendant saw another man, to whom defendant said, "Get back in that room

this is none of yours." When defendant discovered that both doors were locked, he left the house using the window by which he had entered. Upon leaving the house, defendant threw the gun away in the middle of the gangway. He never went back to look for it. Defendant also stated that, when police found him a few days later, he agreed to accompany them to the police station to tell them what he knew about the shooting.

Robert Banks also testified for the State. Banks lived at 825 North Lawndale as well, but on the first floor. Herb Handy, the victim, lived on the second floor. On the night of the murder, Banks heard the victim come home and go upstairs. He could also hear someone yelling from outside up to the second-floor window. Banks stated that he then heard Handy open a window and yell, among other things, "Come on in, [expletive]," down to the person on the street. The discussion continued for four or five minutes, in Banks' estimation. After the yelling stopped, he saw Handy come downstairs and walk back into the kitchen of the house. Banks then heard a thumping or banging against the wall, followed by gunshots. The thumping sounded like a bat or a stick hitting the wall. Banks jumped up when he heard the gunshots and walked down the hall. He was then confronted by another, unknown man. This other man carried a gun, an automatic, and identified himself as the police; the intruder then instructed Banks to return to his room and lie down on the floor. Banks knew the man was not a police officer and refused to comply. Banks ran upstairs and prepared to jump out the window, but he called for help instead. Meanwhile, the intruder left the way he came in because both doors were locked. In a lineup conducted a few days later, Mr. Banks could not identify anyone as the intruder he saw.

Detective Ralph Vucko testified next. He stated that he and his partner responded to a call of a person shot at 825 North Lawndale on January 17, 1994, at approximately 8:30 in the evening. As he investigated the scene, he noted that the recently fallen snow had been disturbed and that a trail had been made in the snow in the gangway that abutted the south side of the building. The trail led to a partially opened window near the rear of the house, where the snow had been disturbed on the ledge. Upon entering the house, Detective Vucko went into the room with the partially opened window he had just seen from the outside. In this room, he observed the victim— already dead but warm to the touch—lying on the ground with gunshot wounds to his chest and back and a bat in his hands. The victim was lying about eight feet away from the window. Vucko also discovered three 9-millimeter shell casings on the floor.

Detective Kato testified again at defendant's trial. Kato's trial

testimony was consistent with the testimony he gave at the hearing on defendant's motion to quash his arrest and suppress statements.

Both parties stipulated as to evidence regarding the victim's autopsy. This stipulation stated, *inter alia*, that the victim died of multiple gunshot wounds and that the victim tested positive for cocaine.

At the close of the State's evidence, defendant moved for a directed verdict. The trial court denied the motion. Defendant also attempted to introduce evidence that would show the victim's violent and aggressive character, pursuant to *People v. Lynch*, 104 Ill. 2d 194, 470 N.E.2d 1018 (1984). The trial court disallowed such evidence. Defendant then rested his case. In closing argument, defense counsel asserted that defendant acted in self-defense when he shot Herb Handy because Handy was violent and aggressive, on drugs and armed with a baseball bat. Alternatively, the defense argued that Handy provoked defendant into mutual combat; as a result, defendant was guilty only of second degree murder. The trial court found defendant guilty of first degree murder and sentenced him to 26 years in the Illinois Department of Corrections.

Defendant's primary argument on appeal is that the trial court erred in denying the motion to quash his arrest and suppress statements. Defendant does not dispute the trial court's finding that he voluntarily accompanied police to the Area 4 police station. Instead, defendant asserts that at some point after he arrived at the Area 4 police station he was illegally detained without probable cause, and the trial court's ruling to the contrary was against the manifest weight of the evidence. We agree and reverse the trial court's order denying defendant's motion to quash his arrest.

■ A motion to quash arrest and suppress statements presents a trial court with a mixed question of law and fact. *People v. Kidd*, 175 Ill. 2d 1, 25, 675 N.E.2d 910, 922 (1997). A reviewing court will not disturb the trial court's ruling on a motion to suppress unless it finds that ruling to be manifestly erroneous. *People v. Oaks*, 169 Ill. 2d 409, 447, 662 N.E.2d 1328, 1345 (1996); *People v. Melock*, 149 Ill. 2d 423, 599 N.E.2d 941 (1992). This is so because such determinations often require the trial court to resolve conflicts in the facts and weigh the credibility of witnesses. *Oaks*, 169 Ill. 2d at 447, 662 N.E.2d at 1345. We acknowledge that the parties presented conflicting testimony at the hearing on the motion to quash. However, this record establishes several undisputed facts. When considering *undisputed* facts in a motion to suppress, so that neither the facts nor the credibility of witnesses is at issue, appellate courts may conduct a *de novo* review. *Oaks*, 169 Ill. 2d at 447-48, 662 N.E.2d at 1345; see also *Ornelas v.*

*United States*, 517 U.S. 690, 134 L. Ed. 2d 911, 116 S. Ct. 1657 (1996) (while findings as to relevant historical facts may be reviewed deferentially, the ultimate determination of probable cause should be reviewed *de novo* on appeal).

■ Both the United States and Illinois Constitutions protect an individual from seizure or arrest without probable cause. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6; *People v. Williams*, 164 Ill. 2d 1, 645 N.E.2d 844 (1994); *Melock*, 149 Ill. 2d at 436, 599 N.E.2d at 946. Illegal detentions for excessive periods, absent probable cause, have also been deemed to violate an individual's constitutional rights. *People v. Walls*, 220 Ill. App. 3d 564, 578-79, 581 N.E.2d 264, 273-74 (1991); see also *People v. R.B.*, 232 Ill. App. 3d 583, 589, 597 N.E.2d 879, 883 (1992) ("Custodial interrogation on less than probable cause violates the fourth amendment whether or not the technical trappings of a formal arrest existed"). The test for determining whether a suspect has been arrested is whether, in light of the surrounding circumstances, a reasonable, innocent person would have considered himself free to leave. *Williams*, 164 Ill. 2d at 11, 645 N.E.2d at 848; *Melock*, 149 Ill. 2d at 437, 599 N.E.2d at 946. Additional considerations included in this analysis are the intent of the police officer, the understanding of the suspect, and whether the suspect was told that he was free to leave. *Melock*, 149 Ill. 2d at 437, 599 N.E.2d at 946.

In their briefs, both the State and defendant offer the seven-factor analysis that our supreme court has determined should be reserved for fifth amendment compulsion issues. *Melock*, 149 Ill. 2d at 432, 599 N.E.2d at 944; see also *In re J.W.*, 274 Ill. App. 3d 951, 957, 654 N.E.2d 517, 521-22 (1995) (following *Melock*). Because the case *sub judice* presents a question of fourth amendment "arrest" rather than fifth amendment "custodial interrogation," this court will follow the distinction announced in *Melock* and focus on whether a reasonable person would have considered himself free to leave. *J.W.*, 274 Ill. App. 3d at 957, 654 N.E.2d at 522.

■ An examination of the record reveals several undisputed facts: (1) defendant, who was only 15 with no prior arrests, and Jackson were originally stopped on the street by five police officers; (2) defendant and Jackson rode to the Area 4 station in separate cars and were placed in separate interview rooms upon arriving at the police station; (3) defendant remained in the same interview room—with the door closed—from his arrival at the station (roughly 8:30 p.m.) until he made his incriminating statement (at 4:30 a.m. the following morning); (4) police officers apprised defendant of his *Miranda* rights several times; (5) defendant was not free to move about the police station; and (6) defendant was never informed that he was free to leave

the station. Moreover, both defendant and Detective Roy testified that the door to defendant's interview room was locked.

After reviewing the aforementioned facts, we can only conclude that a reasonable, innocent person placed in defendant's position would not have felt himself free to leave. The State does not contend that probable cause to arrest defendant existed prior to his inculpatory statement. Even if we accept the trial court's finding that defendant voluntarily accompanied the police, we believe that defendant's presence at the Area 4 station escalated to an involuntary seizure prior to his formal arrest. *R.B.*, 232 Ill. App. 3d at 592, 597 N.E.2d at 885; *Walls*, 220 Ill. App. 3d at 579, 581 N.E.2d at 274 (finding it difficult to believe "that citizens typically agree to spend extended periods of time at police stations, kept in small windowless rooms, waiting for the police to conduct their investigations and obtain probable cause for their arrest"). Absent probable cause, the involuntary seizure of defendant constituted a violation of his fourth amendment rights. We therefore find that the ruling of the trial court denying defendant's motion to quash was manifestly erroneous.

In reaching our decision, special weight was given to defendant's age and lack of criminal background at the time of the occurrence. "[C]ourts must be especially cautious in cases involving juveniles because the coerciveness of a situation is thereby enhanced." *People v. Cole*, 168 Ill. App. 3d 172, 179, 522 N.E.2d 635, 639 (1988) (16-year-old defendant with no prior experience with the criminal justice system was seized in violation of his fourth amendment rights); see also *R.B.*, 232 Ill. App. 3d at 592, 597 N.E.2d at 885 (illegal seizure of a 15-year-old defendant); *J.W.*, 274 Ill. App. 3d 951, 654 N.E.2d 517 (illegal seizure of a 14-year-old defendant). The State fails to cite to any case in which a court determined that a minor, detained in a fashion analogous to defendant's experience, was legally seized. Although defendant failed to inform the police of his true age until after his formal arrest, the fact remains that defendant was a 15-year-old minor throughout his questioning by police.

Of course, a finding that defendant was subject to an illegal arrest does not resolve the question of whether defendant's inculpatory statement was properly admissible at trial. *People v. Barlow*, 273 Ill. App. 3d 943, 654 N.E.2d 223 (1995); *Walls*, 220 Ill. App. 3d at 579, 581 N.E.2d at 274. "A confession obtained after an illegal arrest may be admissible where it was obtained by means sufficiently distinguishable to be purged of the taint of the illegal arrest." *Barlow*, 273 Ill. App. 3d at 952, 654 N.E.2d at 231. The determination of whether a confession was sufficiently attenuated from the illegal arrest hinges upon the following considerations: (1) the temporal proximity between

the arrest and the confession; (2) the existence of intervening circumstances; (3) the purpose and flagrancy of the police misconduct; and (4) whether the defendant received *Miranda* warnings. *Barlow*, 273 Ill. App. 3d at 952, 654 N.E.2d at 231; *J.W.*, 274 Ill. App. 3d at 962-63, 654 N.E.2d at 525. In light of its ruling on defendant's motion to quash his arrest, the trial court never considered the attenuation issue. Remandment for an attenuation hearing is appropriate where the record is not clear enough to allow a reviewing court to make an independent ruling on the matter. *Walls*, 220 Ill. App. 3d at 579, 581 N.E.2d at 274 (confrontation of a defendant with statements from other witnesses inculpating that defendant as the shooter may have attenuated a confession from the illegal arrest). Accordingly, we reverse defendant's conviction and remand this cause for a hearing to determine whether defendant's inculpatory statement was sufficiently attenuated from his illegal arrest to warrant its admissibility. See *Barlow*, 273 Ill. App. 3d at 953, 654 N.E.2d at 231 (and cases cited therein).

■ Defendant next argues that Assistant State's Attorney Rodi, who transcribed defendant's inculpatory statement, improperly advised him of his *Miranda* rights. In support of this contention, defendant points to Ms. Rodi's trial testimony in which she stated that she would give defendant his *Miranda* warnings when the officers returned and that they "were going to have a statement." Defendant argues that Ms. Rodi's statement vitiated the effect of any proper *Miranda* warnings and hence rendered the statement involuntary. The State points out (and defendant concedes) that a trial court's ruling that a statement is voluntary will not be disturbed unless that ruling is against the manifest weight of the evidence. *People v. Miller*, 173 Ill. 2d 167, 181, 670 N.E.2d 721, 728 (1996). In the present case, ample evidence supported the trial court's conclusion that defendant was apprised of and understood his *Miranda* rights. We reject defendant's second point of error.

■ Defendant also asserts that the trial court erred in excluding defense evidence regarding the victim's allegedly violent and aggressive character, where such evidence was properly admissible under *Lynch*. "[W]hen the theory of self-defense is raised, the victim's aggressive and violent character is relevant to show who was the aggressor, and the defendant may show it by appropriate evidence, regardless of when he learned of it." *People v. Lynch*, 104 Ill. 2d 194, 200, 470 N.E.2d 1018, 1020 (1984). Nevertheless, a decision on the admission of evidence is within the sound discretion of the trial court, and such evidentiary rulings will be upheld absent a clear showing that the court abused its discretion. *People v. Booker*, 274 Ill. App. 3d 168, 653 N.E.2d 952 (1995). The evidence here established that the victim

was entitled to be inside 825 North Lawndale when defendant climbed through an open window and shot the victim several times, causing his death. In light of this evidence, defendant's self-defense claim was spurious at best and the trial court did not abuse its discretion in excluding the proffered *Lynch* testimony. Defendant's third challenge on appeal must fail.

■ Defendant further argues that the trial court erred when it admitted Detective Kato's testimony regarding the steps of his investigation, where that testimony contained prejudicial hearsay. Defendant complains that Kato was permitted to testify as to what Coloia Wilkerson told him and that the alleged hearsay statement of Wilkerson damaged defendant's credibility. The State counters that Wilkerson's out-of-court statement was not offered to prove the truth of the matter asserted and therefore did not constitute hearsay. "A police officer may testify about statements made by others, such as victims or witnesses, when such testimony is not offered to prove the truth of the matter asserted, but is instead used to show the investigative steps taken by the officer leading to the defendant's arrest." *People v. Pulliam*, 176 Ill. 2d 261, 274, 680 N.E.2d 343, 350 (1997). We agree with the State and find that Wilkerson's statement was not offered for its truth; as such, the statement was not hearsay and Kato's testimony was entirely proper.

■ As his final point of error, defendant argues that his conviction for first degree murder should be reduced to second degree murder because the evidence established that defendant had an unreasonable belief that he needed to use deadly force in self-defense and because the victim seriously provoked defendant. When reviewing a challenge of this sort, the appellate court must consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present. *People v. Blackwell*, 171 Ill. 2d 338, 358, 665 N.E.2d 782, 790 (1996).

■ In this case, either the presence of a serious provocation or an unreasonable belief in the need for deadly force would constitute a mitigating factor. As support for his claim of serious provocation, defendant points to the harsh and abusive language of the victim. We reject this assertion. "Mere words and gestures, however, are not enough to constitute serious provocation." *Blackwell*, 171 Ill. 2d at 358, 665 N.E.2d at 791. Alternatively, defendant argues that he had an unreasonable belief that deadly force was necessary, in light of the fact that the victim carried a baseball bat. The overwhelming evidence presented to the trial court nullified this fact, namely, defendant's trespass onto the crime scene (by climbing through a window) while armed

with a 9 millimeter semiautomatic handgun. A rational trier of fact could have found that the suggested mitigating factors were not present. As a result, defendant's fifth and final point of error lacks merit.

In light of the foregoing analysis, we reverse defendant's conviction and remand this case to the trial court for an attenuation hearing regarding defendant's inculpatory statement. Should the trial court find defendant's confession sufficiently attenuated from his illegal arrest, we direct the court to reinstate defendant's conviction. In the alternative, if the trial court determines that no such attenuation exists to purge the confession from the taint of defendant's illegal arrest, we direct the trial court to suppress the confession and conduct further proceedings consistent with this opinion. *Barlow*, 273 Ill. App. 3d at 953, 654 N.E.2d at 231; *J.W.*, 274 Ill. App. 3d at 963, 654 N.E.2d at 525.

Reversed and remanded.

BUCKLEY, J., concurs.

PRESIDING JUSTICE O'BRIEN, specially concurring:

I concur with the result of the majority but disagree with the majority's analysis that the defendant's presence "escalated" to an involuntary seizure at some undefined time prior to his formal arrest. In this case, once the door to the room containing the defendant was locked, it was objectively true that the defendant was not free to leave and was, thus, in custody.

On all other issues, I concur.