No. 2-09-1196    Filed: 9-16-10

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of De Kalb County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08--CM--1548 |
| ELLIS AGNEW-DOWNS, | ) ) | Honorable Leonard J. Wojtecki, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Following an altercation at a college dance, defendant, Ellis Agnew-Downs, was convicted of resisting a peace officer (720 ILCS 5/31--1(a) (West 2008)) and unlawful consumption of alcohol by a minor (235 ILCS 5/6--20 (West 2008)). For the resisting a peace officer conviction, defendant received 18 months' conditional discharge, 2 days' incarceration, and a fine. For the unlawful consumption of alcohol conviction, defendant received 18 months' court supervision. Defendant appeals both convictions, and we affirm.

I. BACKGROUND

In relation to the incident, defendant was charged by complaint with two counts on October 6, 2008. Count I alleged that defendant "knowingly resisted the performance of Jefferey Riddell of an authorized act within his official capacity, being the arrest of [defendant], knowing Jefferey Riddell to be a peace officer engaged in the execution of his official duties, in that he pushed, shoved

Jefferey Riddell."  Count II alleged that defendant, a person under the age of 21, knowingly consumed an alcoholic liquor.

A two-day bench trial commenced on July 7, 2009.  Jefferey Riddell, an officer at Northern Illinois University, testified first as follows.  Riddell had worked as an officer for the university about eight months at the time of the incident, which occurred on September 27, 2008.  On that date, Officer Riddell, who was in uniform, supervised the pat-down area for a dance event at the recreation center.  Inside the recreation center, a hallway led to the gymnasium, where the dance was held.  The entrance to the gym consisted of two sets of doors separated by a concrete divider.  Attendees could freely enter and exit either set of doors.

Around 12:20 a.m., Officer Riddell saw that a student, later identified as Allen, was "extremely intoxicated"; he could barely stand up and was vomiting.  Based on Allen's condition, another officer ordered an ambulance.  Defendant first came to Officer Riddell's attention when defendant tried to remove Allen from the dance.  Defendant was yelling that Allen was "all right" in order to prevent Allen from leaving in an ambulance, and defendant was physically removing Allen from the building.  Although Officer Riddell's supervisor had instructed him to cancel the ambulance, dispatch advised Officer Riddell that it was too late to cancel because the ambulance was already on its way.  Someone must have communicated this information to defendant, because defendant ceased attempting to help Allen out of the building.  Allen sat down in a chair near the entrance to the gym and began vomiting profusely all over the floor.

Defendant and another student, later identified as Marcus Ward, were in the same area as Allen "and for some reason were becoming extremely belligerent, being loud and very vocal."  A female officer, Weyni Langdon, and a female sergeant, Lucinda Brunner, were trying to calm the

situation, but Ward was becoming extremely agitated. Officer Riddell felt that Ward might strike one of the students or one of the officers, and that he needed to escort Ward from the dance to defuse the situation. Officer Riddell instructed Ward that he would need to leave based on his behavior, and Ward was "extremely compliant," agreeing to leave with his girlfriend, Kristin Lee.

To exit the building, it was necessary to go through the doors to the gym, and then across the gym to an exit door. Officer Riddell wanted to make sure that Ward and Lee exited the building rather than just mingling back into the crowd in the gym. As Officer Riddell proceeded to escort the two out, defendant forced his way between Officer Riddell and Ward and Lee, blocking the left set of doors to the gym. Defendant "came from [Officer Riddell's] right side and wedged himself between" Officer Riddell and Ward and Lee, "placing his body with his back towards [Officer Riddell] and sticking his arms out." Defendant then took a couple of steps back and forced his body into Officer Riddell, pushing Officer Riddell back. The force was enough to displace Officer Riddell's body but not knock him over. Next, defendant grabbed hold of the "door jamb itself, the doorway entrance" to the gym and blocked Officer Riddell's ability to move forward and escort the two out. While doing this, defendant was telling Ward and Lee to "Go. Go. Go." Officer Riddell admitted that his police report did not include defendant's statement to "Go. Go. Go." On cross-examination, Officer Riddell conceded that he did not simply walk around to the right set of doors to the gym to escort Ward and Lee out of the dance. However, Officer Riddell explained that he could not ignore the fact that defendant had physically pushed him.

Officer Riddell advised defendant that he needed to get out of the way so that Officer Riddell could "escort those individuals out." Defendant either refused or ignored him. Officer Riddell admitted that he never had a "direct conversation" with defendant or made direct eye contact. As

Officer Riddell instructed defendant to release himself from the door and let Officer Riddell go by, defendant failed to comply. Officer Riddell then told defendant that defendant needed to leave the area and be escorted out too. With defendant still "maintaining hold," Officer Riddell, using his left hand, grabbed defendant's left arm just above the wrist and placed his right arm on the back of defendant's triceps. On cross-examination, Officer Riddell testified that he was not arresting defendant at that time; his intent was to "just escort [defendant] from the dance as well."

At this point, defendant broke away from Officer Riddell and somehow knocked down Officer Heard, who was nearby. Officer Riddell thought that defendant used his hands to knock Officer Heard out of the way; defendant knocked him down intentionally. Officer Riddell "had to get control" of defendant to prevent him from assaulting Officer Heard while he was on the ground. At this time, Officer Riddell noticed Officer Heard's baton, still collapsed, rolling around on the ground. Officer Riddell did not know whether the baton just fell off of Officer Heard's belt or whether defendant was trying to disarm Officer Heard. Officer Riddell grabbed defendant by wrapping his arms around the front of defendant's arms and interlocking his hands behind defendant's back. Officer Riddell then pulled his own weight up to get defendant off of Officer Heard and stand him up. During this time, defendant continued to resist and fight with Officer Riddell and to try to free himself from Officer Riddell's hold. In particular, defendant was "motioning his body back and forth trying to buck [Officer Riddell] off of him." In addition to the officers already present, who included Officers Riddell, Heard, and Langdon and Sergeant Brunner, two more officers came onto the scene. All of the officers were in uniform.

Officer Riddell was then asked what happened "after [he] had grabbed a hold of the defendant and he was trying to resist [him] for a second time." Officer Riddell explained that he was

able to turn them around in order to get back into the hall area, which was less crowded. Defendant then "pushed" the two of them "back into a set of lockers" that lined the wall along the hallway. Officer Riddell still had hold of defendant's arms as defendant continued to try "to break himself free." Officer Heard and Sergeant Brunner helped gain control of defendant. Officer Riddell determined that defendant needed to be handcuffed to "get him to stop resisting, and to prevent the chance of harming any of the officers and/or anyone else in the area." Officer Riddell's grip on defendant still gave defendant the use of his lower arms. As a result, Officer Riddell "made the determination" that they were going to have to get defendant down onto the ground "in a prone position" in order to handcuff him, "as he was continuing to resist the entire time." The officers got defendant to the ground and handcuffed him. Next, Officer Riddell got defendant up, walked him outside, and explained that he was under arrest for resisting a peace officer. While talking to defendant, Officer Riddell noticed the odor of alcohol on his breath.

On cross-examination, Officer Riddell testified that defendant should not have come into contact with Allen's vomit during the altercation, because the vomit was against the left wall, and the lockers that they ended up against were on the right wall.

Sergeant Jason John, who was on duty outside the dance at the time of the incident, testified next as follows. After Officer Heard advised him that there was an altercation inside, Sergeant John went inside "towards the middle to the end of this incident." He observed Officer Riddell instruct defendant to let go of a crash door that led into the dance. It was hard to describe what part of the door defendant was holding onto; Sergeant John thought it was the edge of the door. Officer Riddell, who was trying to get inside the gym, told defendant to let go of the door two or three times. Defendant was "very loud and very angry with Officer Riddell." Sergeant John recalled that Ward's

girlfriend Lee yelled something and that then defendant pulled away from Officer Riddell, who had defendant by the arm. Defendant pushed back Officer Riddell, who was behind him, and he pushed Officer Heard, who was in front of him.

Officer Daniel Leifker handled the booking process for defendant's arrest. Though defendant denied drinking, Officer Leifker smelled a strong odor of alcohol on his breath, and defendant's eyes were glassy, red, and bloodshot.

Defendant testified as follows. He arrived at the dance around midnight and had not been drinking earlier. Defendant's friends told him that some guy named Allen, defendant did not know his last name, was not feeling well. Because Allen was "dazed," defendant thought he was intoxicated. Defendant talked to Allen "for a second." Defendant thought Allen was not in any condition to enjoy the dance, so he wanted to arrange for a mutual acquaintance to pick up Allen. As defendant was helping Allen walk towards the exit, a few officers advised defendant that he could not take Allen from the dance. The officers did not explain why, and Derrick Smith, a professor at the university who was chaperoning the event, told defendant to help get Allen out of the building. Defendant understood from the officers that he would get in trouble or arrested if he did not relinquish Allen, however, so he did. Allen then sat down in a chair and began vomiting some more.

Defendant, who was standing near the "left-most door" to the gym, discussed the matter with Smith and some friends as they waited for the ambulance to arrive. Ward, who lived in defendant's neighborhood, was another concerned friend of Allen's. Defendant denied that he and Ward became belligerent with each other; defendant was "an associate" of Ward. Although he did not come to the dance with Ward, they stood in line together. Defendant was not aware that Ward had been asked to leave, because defendant was talking with Smith about Allen's situation. Defendant was talking

with some friends when he "was just kind of brushed up against on the back and kind of grabbed." Defendant "yanked" and "looked back like to figure out what was going on and this officer was trying to" arrest him. The officer "had his cuffs out trying to get" defendant. Defendant was "caught off guard" when Officer Riddell grabbed him from behind. Although defendant may have grabbed the door initially to see what was going on, he did not continually hold on to the door. Officer Riddell did not say anything to defendant prior to grabbing his arm. Defendant did not know that Officer Riddell was behind him until Officer Riddell grabbed his arm. None of the officers told defendant that he was under arrest; they told defendant that he was being escorted from the dance. Defendant denied blocking Officer Riddell or standing between Officer Riddell and Ward and Lee; he denied interfering with Officer Riddell in any way.

Officer Heard then came on the scene and tried to "take" defendant "down" a few times. The first time Officer Heard lunged at defendant, defendant moved out of the way, causing Officer Heard to miss him. Defendant did not know if Officer Heard fell down. Officer Heard then became "more angry" and hit defendant in the leg a few times with the baton. Defendant never pushed Officer Heard or knocked him down. Two more officers assisted in getting defendant to the ground. Defendant never pushed any of the officers; he was "simply trying to avoid" being thrown into a "puddle of throw-up." Defendant did not know how he smelled of alcohol unless there was some alcohol on his clothes, or unless the odor came from some of the vomit that had gotten on his clothes.

Derrick Smith, a teacher and counselor at the university, testified as follows. Initially, Smith advised defendant to help his friend Allen, who was intoxicated, out of the dance. Smith then heard Sergeant Brunner telling defendant that he could not take Allen out of the building, because doing

so would create a liability for the university. Based on this information, Smith pulled defendant aside and apologized for giving him incorrect advice. Defendant "backed off" and helped Allen sit down in a chair. After that, another "guy," whom Smith did not know, came out "screaming and hollering and cursing" at the police officer and Smith. The guy pushed a "young lady out of the way" and was apparently "trying to defend" Allen, who was in the chair. Smith and defendant were talking in the doorway of the gym when they heard a police officer say, " 'I told you to leave twice.' " Smith replied, " 'We didn't do anything,' " and defendant said, " 'All you had to do was ask me to move.' " Then, another officer rushed from the side and said, " 'You heard what he said,' " and he "went to grab" defendant. Both of the officers converged on defendant. Smith tried to tell the officers that this was not necessary and that they should let Smith talk to defendant. When one of the officers almost fell down, the officer gave Smith a "little look," so Smith "knew what was going on," and he backed up and let the officers continue. The officers put defendant's arms behind his back. All the while, defendant was calling on Smith and asking the officers what they were doing. When the officers got defendant in the hall, one officer kicked defendant's leg four or five times in order to knock defendant down. Defendant fell face down and both of the officers jumped on his back and handcuffed him. Defendant was not told he was under arrest until after he was handcuffed. Smith denied that defendant blocked the officers from going in the gym, and he denied that defendant placed himself between the police and other people at the dance.

Patrick Thomas testified that he went to the dance with defendant. Both of them tried to escort Allen out of the dance until they were instructed by police not to do so. After that, Thomas, defendant, and Smith were standing in the hall near the doorway to the gym. Then, down the hall there was a scuffle that moved in their direction. Thomas saw that an officer "had come into contact

with [defendant] and very quickly the contact turned from maybe a couple words being exchanged to a very like violent attack on" defendant. Defendant did not push or shove any of the officers or prevent any of them from entering the gym; he was just standing there. Thomas testified that "[m]aybe the officer was trying to come through the door and instead of wanting to go around or anything he just wanted to move [defendant] out of the way." Defendant did not put up a fight about moving out of the way. Thomas thought that the officer was trying to "slam [defendant] into the vomit, for no particular reason, from behind." After the first officer got physical, another officer got violent after he could not shove defendant into the vomit. At this point, defendant had surrendered. Three officers put their knees on defendant's back and used their batons to hit his legs while he was on the ground.

During the State's argument, the State maintained that defendant did not have to be resisting arrest; he simply needed to be resisting an authorized act by the officer. The court, however, noted that the complaint alleged that defendant had resisted arrest. At what point, the court wanted to know, was defendant under arrest, because in "order to resist, one must first be under arrest." Defendant similarly argued that the purpose of a charging instrument was to fairly apprise him of what he was charged with, and that there was "no indication here that the nature of the criminal conduct on the part of the defendant [had] to do with obstructing an officer." During the State's rebuttal argument, it argued that Officer Riddell was struggling with defendant, who was pushing him; that Officer Riddell had to grab defendant while defendant continued to struggle; and that defendant pushed another officer to the ground. The court indicated that its notes showed that the pushing and shoving occurred prior to the arrest, and it asked the State to address this issue. The State agreed that the formal arrest in which defendant was advised that he was under arrest occurred

later. Still, the State argued that the act of taking defendant "into arrest, taking him into custody under the statute, started from the very beginning when [defendant] was told, 'Sir, you need to move.' " According to the State, defendant did not move out of the way, but started to push Officer Riddell back. Then, there was continued pushing after that, in that Officer Riddell put defendant in a "bear hug"; defendant continued to push Officer Riddell back against the lockers or the wall; and defendant continued to flail his arms and struggle. The court next wanted to know the basis for defendant's arrest. The State replied that, at that point, Officer Riddell could have arrested defendant for obstructing Officer Riddell's "authorized act" of "trying to get control of the situation" and "do crowd control" by escorting out an individual who had "been belligerent."

The court found defendant guilty of unlawful consumption of alcohol but reserved its ruling on the resisting arrest charge. Specifically, the court noted that defendant was not charged with pushing down Officer Heard; rather, he was charged with pushing and shoving Officer Riddell in the process of being arrested. The court's recollection of the evidence was that "the shoving and pushing occurred before the arrest" and thus would not qualify as "resisting according to the complaint."

On August 20, 2009, the parties appeared in court for the ruling on the resisting charge. The court stated that it had reviewed the transcript and was finding defendant guilty of resisting a peace officer. According to the court, "the resisting occurred after an arrest."

The parties' agreed-upon sentence was approved by the court, and defendant timely appealed.

## II. ANALYSIS

### A. Resisting a Peace Officer

-10-

Defendant makes several arguments why the evidence was insufficient to prove him guilty beyond a reasonable doubt of resisting a peace officer. A criminal conviction will not be set aside unless the evidence is so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt. People v. Synnott, 349 Ill. App. 3d 223, 228-29 (2004). "In reviewing the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " Synnott, 349 Ill. App. 3d at 229, quoting People v. Collins, 106 Ill. 2d 237, 261 (1985).

As previously mentioned, defendant was charged in this case with knowingly resisting the performance by Officer Riddell of an authorized act within his official capacity, being the arrest of defendant, knowing Officer Riddell to be a peace officer engaged in the execution of his official duties, in that he pushed and shoved Officer Riddell. The statute under which defendant was charged is section 31--1(a) of the Criminal Code of 1961, which provides: "A person who knowingly resists or obstructs the performance by one known to the person to be a peace officer, firefighter, or correctional institution employee of any authorized act within his official capacity commits a Class A misdemeanor." 720 ILCS 5/31--1(a) (West 2008). The statute prohibits a person from committing a physical act of resistance or obstruction--a physical act that impedes, hinders, interrupts, prevents, or delays the performance of the officer's duties, such as by going limp or forcefully resisting arrest. People v. McCoy, 378 Ill. App. 3d 954, 962 (2008). "Resisting" or "resistance" means withstanding the force or effect of or the exertion of oneself to counteract or defeat. Synnott, 349 Ill. App. 3d at 225.

Before addressing defendant's arguments, we begin by clarifying the sequence of events, and specifically the point at which defendant was arrested. Officer Riddell testified that when defendant held on to the door and blocked his ability to escort Ward and Lee from the dance, he grabbed defendant's arm and placed his arm on defendant's triceps, not to arrest him, but to escort him from the dance as well. Officer Riddell's testimony that he was not arresting defendant at this point contradicts the State's answer to the court that the act of arresting defendant "started from the very beginning" when defendant was told "to move." In any event, the sequence of events is important because defendant focuses many of his arguments on the time period before Officer Riddell placed defendant under arrest. Although the trial court recognized that pinpointing the time of arrest was crucial in determining whether defendant had in fact resisted arrest, the court did not specify at what point defendant was actually under arrest. Still, the court reviewed the transcript and determined that the resisting occurred after the arrest, and we are able to infer the time of arrest based on Officer Riddell's testimony. According to Officer Riddell, it was not until defendant broke away from him and used his hands to knock down Officer Heard that Officer Riddell determined he "had to get control" of defendant, which we interpret as arresting defendant. See People v. Washington, 363 Ill. App. 3d 13, 23 (2006) (an arrest occurs when a person's freedom of movement is restrained by physical force or a show of authority; the test for determining whether a suspect has been arrested is whether, in light of the surrounding circumstances, a reasonable, innocent person would have considered himself free to leave). After Officer Riddell grabbed hold of defendant the second time, defendant "pushed" the two of them into a set of lockers and continued to try to break himself free.

With this time line in mind, we turn to defendant's first argument, which is that he was not aware that Officer Riddell was a peace officer at the time of his alleged resistance. To support his

position, defendant contends that Officer Riddell was standing behind him during "the relevant stages" of the encounter; Officer Riddell admitted that he never made eye contact with defendant or had a direct conversation with him; defendant allegedly ignored Officer Riddell's requests to move and did not act in a manner demonstrating that he knew Officer Riddell was a peace officer; and defendant was never told he was under arrest until he was in handcuffs. Defendant's argument lacks merit.

First, it is undisputed that Officer Riddell, like the other officers, was in uniform. Second, defendant concedes that if Officer Riddell's version of events, which differed dramatically from defendant's, was believed, then it would permit the inference that defendant was indeed aware that Officer Riddell was a peace officer. At trial, Officer Riddell testified that he "would have to think [defendant] saw me as [defendant] positioned himself between Mr. Ward and his girlfriend and myself." While the trial court did not express any factual findings in this case, it apparently credited Officer Riddell's testimony over defendant's. Third, defendant's own testimony belies the claim that he was not aware that Officer Riddell was a peace officer. Defendant testified that he did not know Officer Riddell was behind him and that he was caught off guard when Officer Riddell grabbed him from behind. However, defendant further testified that when he "looked back to figure out what was going on," "this officer was trying to" arrest him. Thus, defendant was aware that Officer Riddell was a peace officer.

In a related argument, defendant challenges Officer Riddell's testimony as incredible and contradicted by the overwhelming weight of evidence introduced at trial. According to defendant, no other witness confirmed Officer Riddell's version of events whereas defendant, Smith, and Thomas all denied that defendant interposed himself between Ward and Lee and Officer Riddell or

backed Officer Riddell out of the gym. Also, defendant argues that Sergeant John's version of events contradicted that of Officer Riddell; and there was no evidence providing a motive for defendant's alleged behavior.

Determinations of witness credibility, the weight to be given testimony, and the reasonable inferences to be drawn from the evidence are responsibilities of the trier of fact, not the reviewing court. McCoy, 378 Ill. App. 3d at 962. While defendant offered a conflicting version of what happened, it was for the trier of fact to determine which version of events to believe. See McCoy, 378 Ill. App. 3d at 963 (although the defendant presented a different version of events, it was for the trier of fact to determine which version of events to believe). In this case, the trial court evidently found Officer Riddell's testimony more credible than defendant's, and we cannot say that the evidence was so improbable or unsatisfactory that it leaves a reasonable doubt regarding defendant's guilt. In addition, it is not accurate to say that Sergeant John's testimony contradicted Officer Riddell's testimony. Consistent with Officer Riddell, Sergeant John testified that Officer Riddell instructed defendant to let go of the door. While defendant takes issue with Sergeant John's description of what part of the door defendant was holding on to, Sergeant John explained that it was hard to describe what part of the door defendant was holding on to; he believed that it was the edge of the door. Moreover, it is of little consequence that Sergeant John did not witness the entire sequence of events leading up to the eventual arrest, because, as previously stated, defendant was not under arrest until he broke away and knocked down Officer Heard. Finally, the State was not required to prove motive. See People v. Curtis, 262 Ill. App. 3d 876, 884 (1994) (motive is not an essential element of a crime).

Defendant next argues that Officer Riddell was not engaged in an authorized act as required under the statute, because a "police officer is not authorized to grab a person from behind as a substitute to establishing his or her authority and communicating with the person verbally." The argument follows that Officer Riddell was not justified in "grabbing [defendant] rather than taking 5 seconds to walk around to [defendant's] front to have a discussion with him face to face." Once again, defendant ignores Officer Riddell's version of events, which the trial court credited, and substitutes his own. Officer Riddell testified that based on Ward's "loud" and "belligerent" behavior, he advised Ward that he needed to leave. Ward was compliant and agreed to leave with Lee. Because Officer Riddell did not want Ward and Lee to blend back in with the crowd, he attempted to escort the two out, which he was authorized to do. See People v. Carroll, 133 Ill. App. 2d 78, 80 (1971) ("authorized" means endowed with authority). To exit the building, it was necessary to enter the gym and walk across it. It was when Officer Riddell was escorting out Ward and Lee that defendant wedged himself between them, forced his body into Officer Riddell and pushed him back, and then grabbed on to the door to block Officer Riddell's ability to move forward. At this point, Officer Riddell advised defendant to get out of the way so that he could escort these individuals out, but defendant ignored his request. Logically, Officer Riddell was also authorized to prevent defendant from impeding this task. While defendant essentially argues that Officer Riddell's response to his conduct was not an authorized act, defendant's argument is dependent on his version of the facts, which the trial court rejected.

Defendant's next argument is that Officer Riddell was not attempting to arrest him when he allegedly resisted, and that he did not resist. We are not persuaded. The flaw in defendant's position is that he focuses on the wrong part of the time line. It is true that when Officer Riddell grabbed

defendant in order to release his hold on the door, Officer Riddell was <u>not</u> attempting to arrest him. Rather, Officer Riddell instructed defendant that he needed to leave the dance as well. It is the series of events that followed, <u>i.e.</u>, defendant breaking away and knocking down Officer Heard, that caused Officer Riddell to seize or arrest defendant by wrapping his arms around the front of defendant's arms and interlocking his hands behind defendant's back. See <u>City of Champaign v. Torres</u>, 214 Ill. 2d 234, 242 (2005) (an arrest made by a peace officer is an "authorized act" under section 31--1). Moreover, even if we assume for argument's sake that the arrest itself was <u>not</u> proper, such a finding would have no impact on defendant's conviction of resisting a peace officer. This is because resistance of even an unlawful arrest by a known officer is a violation of section 31--1. See <u>Torres</u>, 214 Ill. 2d at 242. Although defendant downplays his conduct, Officer Riddell testified that defendant continued to resist and fight by "motioning his body back and forth trying to buck [Officer Riddell] off of him," and that defendant pushed both him and Officer Riddell back into a set of lockers. See <u>McCoy</u>, 378 Ill. App. 3d at 962 (the acts of struggling or wrestling with a police officer are physical acts of resistance that will support a conviction of resisting a peace officer, even if the underlying attempted arrest is unwarranted). For this reason, Officer Riddell made the determination that defendant needed to be in a prone position on the ground in order to be handcuffed, and it took additional officers to accomplish this task. Lastly, defendant's claim that there was no one point where he should have known he was under arrest is belied by his testimony that when he looked back to see what was going on, an officer was trying to arrest him. In sum, there is ample evidence to support the trial court's finding that defendant resisted arrest.

Defendant's final argument with respect to the resisting a peace officer charge is that he was justified in preventing the police from tripping him or throwing him to a hallway floor covered in

vomit. On the one hand, defendant concedes that a person is not authorized to use force to resist an arrest that he knows is being made by a peace officer, even if he believes that the arrest is unlawful and the arrest in fact is unlawful. See 720 ILCS 5/7--7 (West 2008). Defendant cites People v. Wicks, 355 Ill. App. 3d 760, 763 (2005), however, for the proposition that an exception to this general rule exists when the officer uses excessive force. In this case, there is no evidence that the officers used excessive force. As the Wicks court went on to say, "the officers were entitled to use the force required to protect themselves and effect the arrest." Wicks, 355 Ill. App. 3d at 764. The altercation here began with defendant placing himself between Officer Riddell and Ward and Lee and using his body to push back Officer Riddell. After defendant grabbed hold of the door to block Officer Riddell from entering the gym, Officer Riddell grabbed defendant's arm and placed his other arm on the back of defendant's triceps. It was defendant who broke free and knocked down Officer Heard. When Officer Riddell saw Officer Heard's baton on the ground, he restrained defendant to prevent defendant from assaulting Officer Heard while he was on the ground. The officers' use of greater force was in direct response to defendant's actions. While defendant argues that being "thrown" onto a floor with "fresh vomit" justified his conduct, Officer Riddell testified that the vomit was a nonissue because it was located in a different area from the altercation. Viewing the evidence in the light most favorable to the State, defendant's argument fails.

## B. Consuming Alcohol as a Minor

Defendant's last argument on appeal is that there was insufficient evidence to convict him of consuming alcohol as a minor. We agree with the State that defendant has forfeited this issue for failing to develop the argument and support it with legal authority. See Sakellariadis v. Campbell, 391 Ill. App. 3d 795, 804 (2009) (the failure to assert a well-reasoned argument supported by legal

authority is a violation of Supreme Court Rule 341(h)(7) (210 Ill. 2d R. 341(h)(7)), resulting in forfeiture).

III. CONCLUSION

For the aforementioned reasons, the judgment of the circuit court of De Kalb County is affirmed.

Affirmed.

SCHOSTOK, J., concurs.

JUSTICE O'MALLEY, specially concurring:

Under the facts as the trial court and the majority resolve them, there is no question that Riddell's removing defendant from the dance constituted "an authorized act within [Riddell's] official capacity," so that, regardless of how Riddell's actions may be classified, defendant's conduct supports a conviction of resisting a peace officer (720 ILCS 5/31--1(a) (West 2008)). The only reason the trial court and the majority require Riddell's actions to have amounted to an "arrest" is that the charging instrument described the authorized act that defendant resisted as Riddell's "arrest of [defendant]" on the date of the dance event.

As the majority notes, an "arrest" occurs when a person's freedom of movement is restrained by physical force or a show of authority, and the test for determining whether a suspect has been arrested is whether, in light of the surrounding circumstances, a reasonable, innocent person would have considered himself free to leave. Slip op. at 10, citing Washington, 363 Ill. App. 3d at 23; see also In re J.W., 274 Ill. App. 3d 951, 957-58 (1995) ("A person has been arrested when his or her freedom of movement has been restrained by means of physical force or a show of authority"). Thus, the word "arrest" is, at least for fourth amendment purposes, "synonymous with" the concept of a

seizure. J.W., 274 Ill. App. 3d at 957. Under these definitions, the word "arrest" exactly describes Riddell's interaction with defendant from the point he took defendant's arm and ordered him to leave. The complaint could have said that defendant resisted Riddell's lawful act, "to wit, Riddell's use of force to control defendant's movement," or it could have just used the shorthand "arrest" to describe the same thing. I see no problem with the State's choosing the latter option. Accordingly, I disagree with the majority that we must determine precisely when defendant was placed under formal arrest. I would hold that, regardless of whether defendant was formally arrested when he pushed Riddell, he was arrested in the sense that he was seized when he pushed Riddell.

The approach of requiring a formal arrest departs from the above definition of "arrest" and introduces unnecessary confusion into this case. While there is in some contexts a distinction between a formal arrest and a lesser seizure (such as a Terry stop (Terry v. Ohio, 392 U.S. 1, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968))) or a community caretaking stop (People v. Luedemann, 222 Ill. 2d 530 (2006)), those distinctions have no bearing on this case. The stop/arrest dichotomy is relevant to determine the length and scope of an investigation that police may impose on a seized individual, but there is no distinction between the force permissible to effect a stop and that permissible to effect an arrest. See People v. Chavez, 327 Ill. App. 3d 18, 31 (2001) ("An 'investigatory stop is not transformed into an arrest by the officers using force' " and " 'it is the length of detention and the scope of investigation that distinguish an arrest from a stop' "), quoting People v. Moore, 294 Ill. App. 3d 410, 415 (1998), and People v. Young, 306 Ill. App. 3d 350, 354 (1999). The encounter between Riddell and defendant did not involve an investigation; it was limited to Riddell's using the force necessary to seize defendant. Therefore, the stop/arrest dichotomy has no relevance here. From the moment Riddell began to use force to control defendant's movement,

defendant was arrested in the sense that he was seized, and it does not matter if that seizure could have justified a more searching accompanying investigation than could a stop.

It is likely true that, if defendant had complied with Riddell from the start, the situation would have diffused, and defendant would not have been formally arrested. The fact that Riddell initially did not intend to formally arrest defendant, however, does not change the analysis. Indeed, even if defendant resisted in the same manner as the facts here indicate, but Riddell declined to formally arrest him, defendant's actions still would have amounted to resistance to Riddell's attempt to arrest him (i.e., seize him by removing him from the dance). That the encounter evolved from a seizure-arrest to a formal arrest does not render irrelevant defendant's conduct prior to the formal arrest.

Further, the charging instrument in this case would make very little sense if its use of the word "arrest" were understood to refer only to a formal arrest, and not to a seizure. It was only after defendant's physical resistance that Riddell resolved to place defendant under formal arrest. In fact, defendant's resistance was the ground for the formal arrest. If defendant was not under formal arrest until after he resisted, then how could Riddell have arrested him for "resisting arrest"? My broader reading of the word "arrest" as meaning "seizure" in the charging instrument is also by far the more likely interpretation under the facts of this case. The complaint against defendant was premised on his "push[ing], shov[ing] [Jefferey] Riddell" on the date of the dance. This language is a clear reference to the evidence that defendant pushed Riddell after Riddell took him by the arm to escort him from the dance, and it leaves no confusion as to the misconduct that defendant was alleged to have committed.

In my view, the word "arrest" as it is used in this case refers to a seizure, not to a formal arrest. Thus, it should be enough to say that the evidence here showed that defendant resisted while Riddell was trying to remove him from the dance, regardless of whether Riddell's actions amounted to a formal arrest or some lesser seizure. Although the trial court based its finding of guilt on the idea that defendant committed acts of resistance after his formal arrest, its finding in the State's favor leaves no doubt that it would also have convicted defendant if it had read the complaint as I would read it, to refer to defendant's pushing or shoving Riddell at some point during their encounter. Thus, I would affirm the trial court's judgment on the basis I describe above.