2025 IL App (2d) 240492-U
No. 2-24-0492
Order filed October 7, 2025

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kane County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 23-CF-953 |
| | ) | |
| DAVON M. SAULSBERRY, | ) | Honorable |
| | ) | David P. Kliment, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices McLaren and Hutchinson concurred in the judgment.

**ORDER**

¶ 1    *Held*: Trial court judgment affirmed where (1) the evidence was sufficient to prove defendant guilty beyond a reasonable doubt of resisting a peace officer causing injury, and (2) although the trial court erred in excluding the audio portion of a police officer's body-worn camera recording as hearsay, the error was harmless.

¶ 2    Following a jury trial in the circuit court of Kane County, defendant, Davon M. Saulsberry, was convicted of one count of resisting a peace officer under section 31-1(a-7) of the Criminal Code of 2012 (Code) (720 ILCS 5/31-1(a-7) (West 2022)).  The offense was elevated from a Class A misdemeanor to a Class 4 felony because defendant's resistance proximately caused injury to a peace officer.  The trial court sentenced defendant to one year in the Illinois Department of

Corrections (IDOC) and six months of mandatory supervised release. Defendant appeals, arguing that: (1) the evidence was insufficient to establish his guilt beyond a reasonable doubt; and (2) the trial court erred in excluding audio from a police officer's body-worn camera recording. We affirm.

¶ 3                    I. BACKGROUND

¶ 4     The following evidence was adduced at trial. On the morning of May 10, 2023, Aurora police officers Brian Rodriguez and Cory McCue were dispatched to the Indian Trail apartment complex in Aurora to assist Mercedes Moreno in retrieving her wallet from defendant, her boyfriend. The complex consisted of townhome-style units with exterior entrances rather than shared hallways. The officers arrived in a marked police vehicle, both in full uniform, and met Moreno in a parking lot directly behind defendant's unit. Dispatch had informed them of an active warrant for defendant's arrest. Both officers were equipped with body-worn cameras.

¶ 5     While the officers spoke with Moreno, defendant emerged from the side of the building and shouted something toward her, to which she responded by shouting back. The officers instructed Moreno to remain by her vehicle, then walked across a grassy area toward defendant, who was about 150 feet away and standing near the rear patio area. Officer McCue testified that defendant's demeanor was "very hostile," and he was yelling.

¶ 6     The officers spoke with defendant but, after a few moments, defendant walked toward the front of the unit, along the side of the building, and indicated that the officers were free to retrieve the wallet. The officers followed him. Both officers testified that they delayed informing him of the warrant and taking him into custody because they hoped to secure Moreno's wallet first. The conversation continued briefly near the front porch, where defendant gestured with his hands while holding a cell phone and vaping device in his left hand. Rodriguez testified that he did not want

defendant to enter the apartment for officer safety reasons.

¶ 7      At that point, Officer Rodriguez reached for defendant's wrists and hooded sweatshirt, stating, "[a]lright, my man, listen, you got a warrant." Defendant immediately pulled his hands back and began to run, but he made it "only a step or two" because the building extended out and blocked his path. McCue then tackled him against the wall of the building. Defendant shouted, "What?" and the officers brought him down to the ground. Defendant landed on his stomach with his arms beneath the sides of his chest against the concrete patio, still holding the phone and vaping device. The officers repeatedly, "about seven" times between them, ordered defendant to place his hands behind his back. Defendant did not comply, but instead shouted, asked what the warrant was for, asserted he had done nothing wrong, and insisted he did not have a warrant. McCue testified that defendant remained "very hostile, and he was yelling and swearing." Moreno stood nearby and twice asked the officers, "What did he do?" Rodriguez told Moreno to "back up"

¶ 8      The officers kneeled on either side of defendant; Rodriguez on the left and McCue on the right. Rodriguez placed his left knee on the ground and his right knee on defendant's lower back. McCue mirrored this position, with his right knee on the ground and his left knee on defendant just below the buttocks. Each officer attempted to pull out the arm on his respective side— Rodriguez using his left hand to reach for defendant's left arm and McCue using his right hand to reach for defendant's right arm—while applying pressure with their other arms to defendant's shoulders.[1] McCue testified that this technique was intended to "use [leverage] to bring his arm behind him." The officers struggled to pull defendant's arms out from beneath him because, as

---

[1]Officer Rodriguez was wearing impact-resistant work gloves with black rubber padding, while Officer McCue's hands were bare.

McCue testified, defendant was "still pulling his arms and holding them underneath his body." While keeping his hands tucked beneath his body, defendant passed the cell phone to his right hand. McCue eventually freed defendant's right arm, pried the phone from his hand, and secured that hand behind his back with a handcuff. McCue testified that defendant did not move his hands behind his back "of his own free will," but rather, he "had to physically grab [defendant's] arms *** and put them behind his back." Rodriguez pulled out defendant's left arm, which still held the vaping device, and placed it behind his back, where McCue secured it with the other cuff. Twenty-seven seconds elapsed from the moment Rodriguez informed defendant that he had a warrant until he was handcuffed. After the cuffs were applied, Rodriguez pried the vaping device from defendant's left hand. Defendant was later transported to the police station by another officer.

¶ 9    McCue sustained cuts to the knuckles on his right hand and two abrasions to his right knee during the incident. McCue testified that the cuts on his hand occurred "[f]rom bringing [defendant's] arm back, having [his] hand underneath [defendant's] body on the concrete," while he was "trying to pull the defendant's arm out from underneath him." He stated that these cuts actively bled and were painful. He further testified that the abrasions to his knee occurred either "[f]rom kneeling on the concrete" or when he "went to the ground" with defendant. McCue further testified that he would not have needed to pull defendant's arms out from beneath defendant had defendant complied with their commands to place his hands behind his back.

¶ 10    At trial, the State introduced footage from McCue's body-worn camera, which was admitted into evidence. The clip shown to the jury began when Rodriguez informed defendant that he had a warrant and concluded after defendant was handcuffed on the ground. Photographs of McCue's injuries were also published to the jury without objection.

¶ 11    Before presenting his case-in-chief, and outside the jury's presence, defendant moved to

admit the complete recording from Rodriguez's body-worn camera. Unlike the abbreviated clip from McCue's camera that was shown to the jury, Rodriguez's recording showed the entire encounter—from the officers' arrival in the parking lot and their conversation with Moreno through the struggle and ending with defendant handcuffed on the ground. The State objected to playing the audio, asserting that it contained hearsay in the form of statements by Moreno, who did not testify, and statements by defendant, and further contending that the recording was not being offered for any proper impeachment purpose. Defendant responded that the audio was not hearsay because the statements were not offered for their truth but to show his mental state, as the officers had spoken to him only about retrieving Moreno's wallet before suddenly seizing him. After reviewing the footage, the court allowed the jury to view the video but excluded the audio. Defendant then submitted the full recording, including the audio, as an offer of proof.

¶ 12    Defendant then recalled Rodriguez and played his body-worn camera footage, without audio. Rodriguez identified Moreno, McCue, and defendant in the video, and explained that he, McCue, and defendant engaged in "a back-and-forth conversation." The defense then rested.

¶ 13    In closing argument, the State argued that defendant resisted arrest by refusing to place his hands behind his back after being taken to the ground, despite being instructed seven times to do so, and that this refusal caused McCue's right hand and knee to scrape on the concrete patio, resulting in injury. It emphasized that "[t]he portion that matters is when the defendant is on the ground and is refusing to let his arms being placed behind his back," which "required Officer McCue to use considerable force as he said to move the defendant's right arm behind his back thus causing the scrapes."

¶ 14    Defendant emphasized during closing argument that he willingly approached the officers, agreed to let them retrieve Moreno's wallet, and was never told he was under arrest or given any

explanation before the police "grabbed at, tackled, and slammed [him] to the concrete *** face down." He argued that the footage from McCue's body-worn camera showed that, "at best," he was told he had a warrant at the same moment Rodriguez reached for him. Defendant contended that the officers should have handled the arrest "much differently" and that his response was an instinctive reaction to being suddenly grabbed and tackled. Defendant contended that the officers' actions, and not his own, caused McCue's injuries, and that the incident reflected a brief reaction rather than knowing resistance. He further asserted that his arms were beneath him because it is natural to brace oneself when falling, and that he was unable to comply with their commands to place his hands behind his back because both officers had their knees on him and were pressing his shoulders down.

¶ 15   After closing arguments, the jury deliberated and returned a verdict finding defendant guilty.

¶ 16   Defendant thereafter filed a motion for a new trial or, alternatively, for judgment notwithstanding the verdict. He argued that the evidence was insufficient because the State failed to prove that he knowingly resisted McCue, "given the quick and reactionary nature of the defendant's alleged actions" or that any resistance on his part was the proximate cause of McCue's injuries. He further contended that the trial court erred in excluding the audio from Rodriguez's body-worn camera, asserting that it was not offered for the truth of the matter asserted but to demonstrate his state of mind and to give context to the events preceding his arrest.

¶ 17    In denying defendant's posttrial motion, the court acknowledged that if the incident had "started and ended with the police officers grabbing [him] and telling him he had a warrant," then defendant's argument that his conduct was merely a reflexive, reactionary movement would have had merit. The court emphasized, however, that defendant "continued to struggle well after the

point in which he knew he was under arrest," and concluded that this ongoing resistance supported the jury's finding that defendant knowingly resisted a peace officer.

¶ 18    In imposing sentence, the trial court observed that what began as a relatively straightforward encounter between the officers and defendant escalated into a more serious incident due to defendant's conduct, which was the proximate cause of McCue's injuries. Nevertheless, the court commented that it "wasn't all [defendant's] fault" because the "[p]olice should have handled this differently." The court sentenced defendant to one year in IDOC, with 451 days' credit for time served in pretrial detention, to be served concurrently with a sentence in an unrelated case.

¶ 19    Defendant timely filed a notice of appeal.

¶ 20                                    II. ANALYSIS

¶ 21    Defendant raises two issues on appeal. First, he argues that the State failed to prove him guilty beyond a reasonable doubt of resisting a peace officer causing injury (720 ILCS 5/31-1(a-7) (West 2022)) because it failed to prove that defendant "pulled away" from McCue, as charged in the indictment, or that he otherwise resisted arrest. He further maintains that the State failed to prove that any alleged resistance caused McCue's injury, given McCue's uncertainty about when exactly he was injured. Second, defendant contends that the trial court erred in excluding the audio from Rodriguez's body-worn camera, noting that no statements on the recording were offered for their truth and that the audio was relevant to whether he knowingly resisted arrest. We address each issue in turn.

¶ 22                          A. Sufficiency of the Evidence

¶ 23    When evaluating a challenge to the sufficiency of the evidence, the question is " 'whether, after reviewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact

could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *Id.* (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979)). Under this standard, all reasonable inferences from the evidence must be drawn in favor of the State. *People v. Baskerville*, 2012 IL 111056, ¶ 31. This standard applies whether the evidence is direct or circumstantial and whether the defendant is tried before a jury or the bench. *People v. Cooper*, 194 Ill. 2d 419, 431 (2000). Our review must encompass all the evidence, not just the evidence that is convenient to the State's theory of the case. *People v. Wheeler*, 226 Ill. 2d 92, 117 (2007). The trier of fact is responsible for determining witness credibility and the weight to be given to their testimony, resolving any conflicts in the evidence, and determining what inferences to draw from the evidence. *People v. Brown*, 2013 IL 114196, ¶ 48. It is not the province of the reviewing court to retry a criminal defendant. *People v. Collins*, 214 Ill. 2d 206, 217 (2005). A criminal conviction will be set aside only if the evidence is "so improbable or unsatisfactory that it creates a reasonable doubt of the defendant's guilt." *Collins*, 214 Ill. 2d at 217.

¶ 24    Here, defendant was convicted of resisting or obstructing a peace officer causing injury under section 31-1(a-7) of the Code. To sustain a conviction for resisting a peace officer, the State was required to prove beyond a reasonable doubt that: (1) the defendant knowingly resisted or obstructed a peace officer; (2) the peace officer was performing an authorized act in his or her official capacity; and (3) the defendant knew the officer was a peace officer. 720 ILCS 5/31-1(a) (West 2022). A conviction for resisting a peace officer is generally a Class A misdemeanor (*id*. § 31-1(a)), but the offense is elevated to a Class 4 felony if the defendant's act of resisting or obstructing "was the proximate cause of an injury to a peace officer" (*id*. § 31-1(a-7)). "Acts of struggling or wrestling with a police officer are physical acts of resistance that will support a conviction for resisting a peace officer." *People v. Thompson*, 2012 IL App (3d) 100188, ¶ 13.

Defendant does not dispute that he knew McCue was a police officer performing an authorized act in his official capacity. Rather, he contends that the State failed to prove he knowingly resisted McCue's authorized act or that his resistance proximately caused McCue's injuries.

¶ 25    Viewing the evidence in the light most favorable to the State, a rational trier of fact could have found defendant guilty of resisting a peace officer causing injury. The trial evidence showed that Officers Rodriguez and McCue were dispatched to the Indian Trail apartment complex after Moreno called 911 seeking assistance in retrieving her wallet from defendant. Before arriving, Rodriguez checked with dispatch and learned that defendant had an active warrant for his arrest. The officers arrived in a marked police vehicle, both wearing police uniforms.

¶ 26    The testimony showed that, when the officers first encountered defendant outside the apartment, he was already agitated, shouting and displaying what McCue described as a "very hostile" demeanor. The officers instructed Moreno to stay back, and defendant continued to yell as they approached him from approximately 150 feet away. The officers closed the distance and briefly engaged him near the rear patio of the apartment but chose to delay executing the warrant, explaining that they hoped to recover Moreno's wallet before taking defendant into custody. Defendant then proceeded around the side of the building on his own, telling them they could retrieve the wallet, and the officers followed.

¶ 27    The encounter resumed on the front porch, where defendant gestured with his hands while holding a cell phone and vaping device in his left hand. Rodriguez testified that he was concerned for officer safety if defendant entered the apartment because he did not know whether any weapons were present. Rodriguez then reached for defendant's wrists and hooded sweatshirt, stating, "[a]lright, my man, listen, you got a warrant." Defendant immediately pulled his arms back and took "a step or two" back, removing himself from Rodriguez's reach. Rodriguez testified that

defendant was unable to get very far, however, because the exterior wall of the apartment blocked his path. McCue tackled defendant against the wall, and the officers brought defendant down to the ground. The testimony and video evidence show that defendant landed on his stomach with his arms beneath his chest against the concrete patio, still holding the phone and vaping device. Rather than comply, defendant pulled his arms away from the officers and actively forced them beneath his body to delay or prevent the officers from effectuating the arrest. Despite being ordered seven times to place his hands behind his back, defendant did not do so. Instead, he shouted, questioned the warrant, denied any wrongdoing, and insisted he did not have a warrant. During the encounter, defendant remained "very hostile," yelling and swearing throughout.

¶ 28     The officers testified that, after tackling defendant, they applied leverage by kneeling on either side of his body and attempting to pull his arms from beneath him to place him in handcuffs. McCue explained that the technique was intended to bring an arm behind the back for cuffing, but the officers struggled because defendant pulled his arms inward and held them tightly beneath his chest. When McCue grasped defendant's right arm under his body and attempted to pull it out, defendant exerted force in resistance, which supports a charge of resisting a peace officer because, " 'resist' implies some type of physical exertion in relation to the officer's actions." *Baskerville*, 2012 IL 111056, ¶ 25. McCue testified that he had to reach underneath to pry the arm free, which took him "several moments, several seconds," to accomplish. He scraped his hand on the concrete patio in the process and was able to secure the cuff only by physically overcoming that resistance and forcing the arm behind defendant's back. McCue emphasized that defendant never moved his arms behind his back voluntarily. McCue also scraped his knee during the encounter.

¶ 29     On appeal, defendant argues that the State failed to prove he engaged in any knowing, physical act that impeded the arrest. He characterizes his conduct as mere "passive non-

compliance" or "inaction," asserting that his arms were beneath him only because he used them to brace his fall when the officers tackled him. In defendant's view, he "took no physical action while on the ground" but merely refused to place his hands behind his back, which is not sufficient to establish resistance. See *People v. Hilgenberg*, 223 Ill. App. 3d 286, 289-90 (1991) (holding that a defendant's refusal to open a door to allow law enforcement to enter was not an act of physical resistance to support a charge of resisting a peace officer) and *People v. Stoudt*, 198 Ill. App. 3d 124, 127 (1990) (reversing conviction for resisting a peace officer where the defendant committed no physical act but merely refused to comply with the officer's command to leave the highway). Defendant further maintains that, "[e]ven assuming [he] had wanted to comply" with the officers' commands, it would have been difficult to place his hands behind his back immediately while lying stomach-down on the concrete, holding a phone and vaping device, as the officers pressed down on his shoulders with their hands and on his lower body with their knees.

¶ 30    Defendant's argument essentially asks us to reweigh the evidence in his favor rather than view it in the light most favorable to the State, which we cannot do. His reliance on the fact that he did not punch, kick, or strike the officers is misplaced, because the relevant question is whether his conduct impeded, hindered, or delayed the officers in the performance of their duties. *People v. Agnew-Downs*, 404 Ill. App. 3d 218, 226 (2001). The footage from McCue's body-worn camera, coupled with McCue's testimony, demonstrates that defendant exerted force to counter McCue's efforts to move his right hand behind his back. See *id*. McCue testified that he had to use his own strength to move defendant's right arm into position for handcuffing, as defendant never did so voluntarily. Throughout the encounter, and particularly while he was on the ground, defendant was "very hostile," yelling and swearing. Only when McCue's strength overcame defendant's did McCue succeed in bringing defendant's hand behind his back and securing his

arm. The jury, having observed McCue's testimony firsthand, was in a superior position to evaluate his credibility, observe his demeanor, and resolve any conflicts in his testimony, and we therefore defer to its assessment. *People v. Richardson*, 234 Ill. 2d 233, 251 (2009). Likewise, defendant's own video evidence shows that he actively forced his left arm beneath his body while Rodriguez attempted to pull it out and secure it behind his back.

¶ 31 In any event, defendant's characterization of the evidence is unpersuasive. His claim that his arms were simply braced beneath him is belied by the fact that he did not drop either the phone or vaping device from his left hand when the officers brought him to the ground. Likewise, his contention that he could not move his arms because the officers were pressing on him is contradicted by the fact that he was able to pass the cell phone from his left hand to his right during the struggle. The video evidence demonstrates that both items had to be forcefully pried from defendant's clutched hands. These contradictions expose his account as implausible and amply support the jury's determination that this was not "passive" noncompliance, but active, deliberate resistance to the officers' efforts.

¶ 32 Defendant also contends that, even if he physically opposed the officers' efforts to pull his arms out from beneath him and secure them behind his back, his conduct amounted to no more than a "*de minimis* reaction that did not actually impede the officers' efforts to arrest him." See *People v. Sadder-Bey*, 2023 IL App (1st) 190027, ¶ 40 (noting that resisting a peace officer requires physical exertion that "actually interferes with the administration of justice," meaning exertion "that *materially* opposes an officer's attempt to perform an authorized act"). (Emphasis in original.) He emphasizes that the officers were able to place him in handcuffs within 27 seconds of Rodriguez first informing him of the warrant and within 20 seconds of bringing him to the ground. This argument is unpersuasive, because the statute does not require that resistance be

prolonged or ultimately successful, only that it materially interferes with an officer's lawful performance of a duty. See *id*.

¶ 33　The video shows, and McCue testified, that defendant forcefully pulled his arms inward while he was on the ground, requiring both officers to use significant strength to pry them free, and that they had to wrest the phone and vaping device from his clenched hands. See *Sadder-Bey*, 2023 IL App (1st) 190027, ¶ 30 (noting that exerting oneself to "counteract or defeat" an officer's acts is sufficient). The brief duration of the struggle reflects not an absence of defendant's resistance, but rather the officers' superior strength, numerical advantage, and more favorable positioning on top of defendant, which gave them leverage to overcome his efforts. Indeed, nearly 30 seconds elapsed before the officers could secure defendant in handcuffs—a delay consistent with other cases upholding convictions for resisting a peace officer. See *Thompson*, 2012 IL App (3d) 100188, ¶¶ 14-15 (defendant resisted for 30 to 45 seconds by throwing elbows at an officer attempting to handcuff him); *People v. Tomlinson*, 2025 IL App (4th) 240510-U (rejecting the defendant's claim of brief "token resistance" where she repeatedly pulled away, attempted to access drawers despite safety concerns, stopped while being escorted, and refused to enter the squad car). The evidence supports the jury's determination that defendant's actions materially impeded McCue's efforts, and his attempts to minimize that resistance as "brief" or immaterial is unavailing and contradicted by the record.

¶ 34　Defendant also argues that the State failed to prove beyond a reasonable doubt that McCue's injuries were proximately caused by his resistance, asserting that McCue was uncertain as to exactly when or how his injuries occurred. Defendant seizes on McCue's testimony that he "would assume" the scrapes on his hand came from the concrete and characterizes his testimony about the timing of that injury as "equivocal at best." He suggests that the injuries may have

occurred during the initial tackle, before defendant could have comprehended that he was under arrest, rather than because of defendant's resistance on the ground.

¶ 35    Defendant misconstrues the record.  It is true that, on direct examination, McCue testified generally that he sustained cuts to his right hand "as a result of [his] interaction with the defendant." However, on cross-examination, McCue specified that his hand was scraped "[f]rom bringing [defendant's] arm back, having [his] hand underneath [defendant's] body on the concrete."  That testimony directly linked McCue's hand injury to defendant's refusal to release his arms, which required McCue to reach beneath him and pull his right arm with sufficient force to overcome that resistance.  Although McCue later added that he "would assume" the scrapes were from the concrete, that remark described the mechanism of the injury rather than its timing.  Viewed in full context, McCue's testimony provided a sufficient basis for the jury to find that the injury occurred during the struggle to free defendant's right arm, which is the precise conduct the State charged as resistance. The jury was entitled to conclude that McCue's hand injury was proximately caused by that resistance, and we therefore reject defendant's argument.  A rational trier of fact, when viewing the evidence in the light most favorable to the State, could reasonably find that defendant's resistance proximately caused McCue's hand injury.  That injury alone is sufficient to sustain a conviction under section 31-1(a-7) of the Code, and we therefore need not consider the knee abrasions or defendant's alternative request to reduce his conviction from a Class 4 felony to a Class A misdemeanor.

¶ 36                    B. Exclusion of Audio from Body-Worn Camera

¶ 37    Defendant's final claim on appeal is that the trial court erred in excluding, as inadmissible hearsay, the audio from Rodriguez's body-worn camera.  He maintains that none of the statements on the recording were offered for their truth but instead were relevant to show his state of mind—

namely, the suddenness with which the encounter escalated and his lack of awareness that he was about to be arrested before Rodriguez suddenly reached for him. In his view, had the jury heard the audio, including Rodriguez's reassurance that they were only there to retrieve the wallet, it might have concluded that defendant did not knowingly resist arrest, because the encounter was too brief for him to grasp what was happening and the sudden arrest was unexpected. The State counters that the court properly excluded the audio from Rodriguez's recording and, in any event, any error was harmless because the evidence of defendant's guilt was overwhelming and the excluded audio would have been cumulative of the officers' testimony.

¶ 38    The record demonstrates that the jury viewed only a short segment from McCue's body-worn camera, beginning when Rodriguez informed defendant that he had a warrant and ending after defendant was handcuffed on the ground. As part of defendant's case, the jury also viewed Rodriguez's body-worn video recording in its entirety, but with the audio muted, beginning when the officers first approached Moren0 in the parking lot.

¶ 39    Defendant submitted the complete recording from Rodriguez's body-worn camera, including the audio, as an offer of proof, making the full video part of the record on appeal. We therefore consider the recording in its entirety, including the audio, in evaluating defendant's claim. We will not repeat what has already been described from the video but will instead describe additional details from the audio that were not before the jury.

¶ 40    The recording captures the entire encounter, which was initiated to assist with a property exchange between Moreno and defendant. Rodriguez, accompanied by McCue, approaches Moreno in a parking lot, who explains that defendant has her wallet containing her credit cards, social security card, and identification. When Rodriguez asks whether defendant was inside the apartment, Moreno responds that he is either in his apartment or at a neighbor's. After Moreno

confirms which unit is defendant's, defendant emerges in the distance from the side of the building. Moreno points toward him and tells the officers, "He's right there. I want my wallet." Defendant shouts something at Moreno, prompting her to walk toward defendant and shout back, "I said give me my wallet." McCue gestures toward Moreno, and Rodriguez tells her to "stay over here." The officers then cross a grassy area toward defendant as he and Moreno continue shouting at each other.

¶ 41    Rodriguez shouts to defendant, "I get you. We're just—we just want to get her wallet. We just want to get her wallet." Defendant shouts in response that "she can get her stuff" and claims that Moreno intentionally left the wallet in his apartment so that she could call the police on him.

¶ 42    The officers close in on defendant until they are only a few feet away. Defendant then states that Moreno is free to leave if she wishes, that she has already called the police on him twice before, and that she was "starting shit," "acting crazy," and trying to "get [defendant] locked up." Rodriguez then asks defendant if he knows where the wallet is, and defendant gestures toward the residence and replies, "Man, go get her stuff. My sister is in the bathroom. She can get her stuff on her own." Defendant then turns and walks off, toward the front of the building.

¶ 43    Both officers trail behind, and Rodriguez says, "Okay. Hold on. Hold on, man. We just— okay, listen. Can we just get her wallet, and then—?" Defendant replies, "Hey, you all coming to get her wallet? That's all you all are coming to do?" Rodriguez answers, "Yeah. That's fine. That's fine." Defendant responds, "Yeah, you all can get her stuff. Get her up out of here." He then rounds the corner and is briefly out of frame from Rodriguez's body-worn camera, and Rodriguez then calls out, "Hey, my man. Wait." Rodriguez nears the corner and, with defendant again in view, asks defendant, "Which way does she go in? This side? Or this side?" Defendant pauses near the front patio and begins to answer, "No, she, look, this morning, she—." As soon

as defendant is within Rodriguez's reach, Rodriguez interrupts, stating, "[a]lright my man, listen, you got a warrant," while simultaneously reaching for him. The remainder of the recording depicts the ensuing struggle—previously shown to the jury through McCue's body-worn camera, but from Rodriguez's perspective.

¶ 44　We agree with defendant that none of the statements in the video were offered to prove the truth of the matter asserted, and the trial court's exclusion of the audio from Rodriguez's body-worn camera on that basis was erroneous. " 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Ill. R. Evid. 801(c) (eff. October 15, 2015). Hearsay is generally inadmissible. See Ill. R. Evid. 802 (eff. Jan 1, 2011). An out-of-court statement, however, is definitionally not hearsay if it is offered for a purpose other than to prove the truth of the matter asserted, such as to show its effect on the listener's state of mind or to explain the listener's subsequent conduct. *People v. Whitfield*, 2014 IL App (1st) 123135, ¶ 25. Although evidentiary rulings are typically reviewed for an abuse of discretion, whether a statement constitutes hearsay is a question of law subject to *de novo* review. *Jackson ex rel. Jackson v. Reid*, 402 Ill. App. 3d 215, 237 (2010).

¶ 45　Here, none of the statements were offered to prove the truth of the matter asserted. For example, when Rodriguez tells Moreno to, "stay over there," the statement is not offered to prove her actual location but to show what was said in defendant's presence and its effect on the developing encounter. Likewise, Rodriguez's repeated assurances to defendant that the officers were there just "to get her wallet" was not offered to prove the officers' true purpose but to demonstrate what defendant was told immediately before Rodriguez announced the warrant, bearing on defendant's perspective of the encounter. The other statements, including those about Moreno, the wallet, entry into the apartment, or who was inside, were not offered for their truth.

Rather, defendant plainly introduced the audio to demonstrate how abruptly the encounter escalated and to support his claim that he did not realize he was under arrest until the struggle was already underway, a circumstance that bore directly on whether he knowingly resisted arrest.

¶ 46     Nevertheless, the exclusion of the audio from Rodriguez's body-worn camera does not warrant reversal or entitle defendant to a new trial.  Although we conclude that the trial court erred in excluding the audio on hearsay grounds, no reasonable probability that the result would have been different absent the error.  We review a trial court's judgment, not its reasoning, and we may affirm on any basis supported by the record.  *People v. Mischke*, 2024 IL App (2d) 240031, ¶ 28. In assessing whether the exclusion of evidence is harmless, a reviewing court may consider: (1) whether the error contributed to the conviction; (2) whether the other evidence overwhelmingly supports the conviction; or (3) whether the excluded evidence would have been duplicative or cumulative.  *People v. Bush*, 2023 IL 128747, ¶ 42.

¶ 47     Although the audio had probative value, it largely corroborates the officers' testimony that they did not mention the warrant until Rodriguez reached to seize defendant.  The segment shown to the jury from McCue's camera begins precisely as Rodriguez tells defendant, "[a]lright, my man, listen, you got a warrant," while reaching for him, and both officers testified that they delayed mentioning the warrant because they hoped to first retrieve the wallet.  Thus, while the audio may have offered the jury additional perspective as to the abruptness of the seizure in a way the testimony alone could not, it would have conveyed nothing new.  The jury already knew that the officers were dispatched to assist in a property exchange, that they delayed arresting defendant while discussing the wallet with him, that Rodriguez mentioned the warrant only when he reached for defendant, and that defendant told the officers that they could retrieve the wallet.  Moreover, we agree with the trial court's finding, made in denying defendant's posttrial motion, that he

"continued to struggle well after the point at which he knew he was under arrest." This prolonged resistance, rather than any momentary confusion on defendant's part, supports the jury's finding that he knowingly resisted a peace officer. Accordingly, the exclusion of the audio, though erroneous, was harmless.

¶ 48                                  III. CONCLUSION

¶ 49    For the foregoing reasons, we affirm the judgment of the circuit court of Kane County.

¶ 50    Affirmed.